JAS. W. SHELDON v. THOS. HOLMES, ABIRAM HOLMES ET AL.

*Bill to vacate discharge of mortgage—Compound interest.*

1. A bill to vacate the inadvertent discharge of a mortgage, and to fore-
close it, was dismissed on appeal, where it appeared that seven years
after the mortgage was discharged the mortgager had sold the land
to his son whose good faith as a purchaser was not to be impeached
by any presumption that his relationship gave him opportunities of
knowing his father's financial condition, or by any such inadequacy
of price as a sum from three-fifths to three-quarters of the value.

2. A party seeking to restore and foreclose a mortgage that has been dis-
charged by mistake and without any fault of the mortgager cannot
have it re-instated to secure any extortionate sum made up by semi-
annual computations of compound interest, even where the mortgage
discharged was made up in that way and had been given to take up
a previous mortgage.

3. On dismissal of a foreclosure bill as against a subsequent bona-fide
purchaser who has not made full payment, he may still be held for
such sums as remain due after he has been notified of complainant's
equities.

Appeal from Calhoun. (Hooker, J.) June 16–17.—
September 29.

BILL to vacate discharge of mortgage and for foreclosure.
Defendant Abiram Holmes appeals. Reversed.

*A. M. Culver* for complainant.

*Edwin F. Uhl* for defendant appellant. Compounding of
interest is illegal: *Van Husan v. Kanouse* 13 Mich. 303;
*Havens v. Jones* 45 Mich. 253; *Hoyle v. Page* 41 Mich. 533;
equity may give relief where a mortgage has by accident
been discharged: Story's Eq. Jur. §§ 117–120, 133–135, 137,
138; *Broughton v. Hutt* 3 DeG. & J. 501; *Bentley v. Mackay*
15 Beav. 12; but not as against a bona fide purchaser: Story's
Eq. 139; Spence's Eq. Jur. 733; *Basset v. Noseworthy* 2
Lead. Cas. in Eq. 1; *Attorney General v. Wilkins* 17 Beav.
285; *Greenslade v. Dare* 20 Beav. 284; *Lane v. Jackson* 20
Beav. 535; *Colyer v. Finch* 5 H. L. Cas. 905–920; *Ogilvie
v. Jeaffreson* 2 Giff. 353–379; *Carter v. Carter* 3 K. & J.

617; a clear and meritorious case must appear: *Shepard v. Shepard* 36 Mich. 173; *Tripp v. Hascig* 20 Mich. 254; parties are assumed to know the meaning and application of their voluntary acknowledgments when they are under no incapacity: *Morton v. Preston* 18 Mich. 60; *Sanger v. Dunn* — Wis. —; *Hunter v. Walters* L. R. 7 Ch. App. 75 : 1 Eng. 437; *Adair v. Adair* 5 Mich. 204; *Rice v. Dwight Manufacturing Co.* 2 Cush. 80; *Moran v. McLarty* 75 N. Y. 25; *Wheaton v. Fay* 62 N. Y. 275–283; *Phillip v. Gallant* id. 256–263; *Holmes v. Hall* 8 Mich. 66; *Peake v. Thomas* 39 Mich. 584; *Johnson v. Van Velsor* 43 Mich. 208; *Baldwin v. Snowden* 11 Ohio St. 203; *Ins. Co. v. Nelson* 103 U. S. 544; *Russell v. Baptist Union* 73 Ill. 337; *Young v. Duvall* 109 U. S. 573; *White v. Smith* 37 Mich. 291–295; equity will protect from extortion: *Briggs v. Withey* 24 Mich. 144; *Messmore v. Huggard* 46 Mich. 564; *McCredie v. Buxton* 31 Mich. 383; *Millard v. Truax* 50 Mich. 343; *Louder v. Burch* 47 Mich. 109; *Butler v. Duncan* id. 94; *Headley v. Hackley* 50 Mich. 43; *Fox v. Holcomb* 32 Mich. 496. ·

COOLEY, C. J. This is a suit in equity. The purpose of the suit is to obtain a decree vacating a discharge of mortgage which was entered upon the record by inadvertence or error, and also a foreclosure of the mortgage as against a party to whom the mortgagor had conveyed the land after the discharge had been entered, but with notice, as the bill avers, that the mortgage had not been paid.

The facts, as they are disclosed by the evidence, we find to be the following:

Thomas Holmes, the mortgagor, borrowed of complainant on May 29, 1860, the sum of fourteen hundred dollars, and gave him a mortgage in consideration thereof for the sum of fifteen hundred dollars, payable in five years from that date, with interest at the rate of ten per cent. per annum, payable semi-annually. In the spring of 1870 the whole principal sum of this mortgage remained unpaid, and also the interest except about a hundred and seventy dollars which had been paid at different times, and complainant began foreclosure. The matter was however arranged between the parties by the mortgagor giving to complainant a new mortgage for the sum of three thousand seven hundred

dollars, which is the mortgage now in suit. The sum was made up by compounding the interest at ten per cent., semi-annually, and adding thereto certain items of costs, expenses, etc., amounting to $253.62. There was no authority of law for thus compounding the interest, and the amount was increased more than a thousand dollars thereby. There is reason to believe, also, that the items of costs and expenses which were charged were extravagant; but no legal duress is shown or claimed, and we shall enter here upon no inquiry whether the mortgagor could have made defense to any part of the mortgage. It is not to be supposed, however, that such a mortgage would have been given except under the pressure of some great necessity.

On November 25, 1872, the mortgagee went to the office of the register of deeds, where the mortgage was recorded, and in his presence entered on the margin of the record a full discharge of the mortgage. Up to that time only two hundred dollars had been paid upon it, and nobody is able to make any explanation how this discharge came to be made. It is suggested that it was made by mistake when the discharge of a different mortgage was intended, but no evidence is given to that effect, and the discharge therefore remains unexplained and unaccountable. The mortgagor was not aware of it for two years or more thereafter, and when it came to his knowledge, he said nothing about it, but made further payments, the whole, up to March 3, 1877, amounting to $943.39. It seems evident that up to that time the mortgagor had formed no purpose to take advantage of the inadvertent or erroneous discharge.

On March 14, 1879, however, the mortgagor with his wife executed to his son Abiram Holmes, then resident in Chicago, a warranty deed of the land mortgaged, for the nominal consideration of six thousand dollars, receiving, as the parties to the transaction claimed, one thousand five hundred dollars in cash and prior indebtedness, and taking back from the grantee a mortgage of four thousand five hundred dollars. There were circumstances attending this trade indicating great haste, and it is not disputed now that Thomas Holmes

had a purpose to take advantage of the discharge and get rid of paying the mortgage. This he justified to himself by the extortion which the complainant had practiced upon him in taking the mortgage, and in the terms exacted. When the papers were presented for record the register of deeds suspected something wrong and immediately notified complainant, who lost no time in instituting this suit.

The chief contention in the suit was over the question whether Abiram Holmes was aware, when he took the deed from his father, that the mortgage had not been paid, and must have been discharged by inadvertence. The circuit judge found that he was, and gave decree of foreclosure for $9080.19, and charged the defendants Thomas and Abiram Holmes personally with all costs. Abiram Holmes alone appealed.

There is no direct evidence that Abiram Holmes was aware, when he received the deed from his father, that his father was not in justice and equity entitled to make a conveyance free of liens. The indirect evidence, however, is strongly relied upon, and is thought to be conclusive.

*First*, it is said there was gross inadequacy in the price which Abiram Holmes was to pay for the land. Complainant produced a number of witnesses whose testimony went to show that the land was worth from $8000 to $10,000, whereas Abiram Holmes was to pay but $6000. A consideration of all the evidence does not, however, make out such a case of gross inadequacy as would be evidence of fraudulent purpose; and in a transaction between father and son, especially when the father was considerably advanced in years, as was the case here, and was expected to remain upon the land, as also appears, the fact of low selling price would scarcely excite remark, unless it appeared that some other party might be wronged thereby. But in this case the question in dispute is whether the son knew that any other person was in position to be wronged thereby; and it cannot well be claimed that the mere fact that his father was willing to sell to him at a low price would charge him with notice of an intended fraud. On the contrary, he had a right

to suppose his father's purposes were honest, and that if the father made any concessions in the matter of price, he did so from proper motives. Large farms are not readily sold at the value the owners and their neighbors place upon 'them, and when one finds a purchaser in his own family he is more likely to accept a low price than if he were to sell to a stranger, and [is] quite justifiable in doing so. And probably the price Abiram was to pay in this case was as large as at a forced sale could have been realized.

Then it is mentioned as a suspicious circumstance that Abiram Holmes procured an abstract of the title to the land, which showed this mortgage to have been discharged. This is charged to have been done for appearances merely and in order that he might be able to make a showing that he was relying upon a clear record. And why, it is asked, should the son, when dealing with his father, go to the record to ascertain what the title was, when presumptively the father would have truthfully told him its exact state? This is a pertinent question, but Abiram Holmes, if he was honest in the transaction, could easily make sufficient answer to it; it is only when we assume that he was dishonest in taking the deed that the procuring of an abstract becomes a suspicious circumstance. Lands, as every lawyer in Michigan knows, were at an early day bought and sold very carelessly, and with little investigation of title; and it often happened after many years' possession and cultivation that a party found to his astonishment that he had no title to land he had bought and long occupied. Experience and observation inculcated prudence; and the reasons for being particular to know what was shown by the record applied as well when one was dealing with his father as when buying of a stranger. There would be a lack of common business caution if he were not thus particular; and common business caution can never, by itself, afford ground of suspicion. Much less can it be proof of intended fraud.

It is further said that for many years Thomas Holmes had been an unthrifty man, and Abiram Holmes had had no reason for believing that he had paid off the mortgage in

question; that it is morally certain, in fact, that he must have known his father had never been able to pay it. The argument drawn from this is that when he found by the abstract from the records that the mortgage appeared to be discharged, he was bound to infer, even if his father had not told him, that a discharge of the mortgage had from some cause been entered without payment and under circumstances which still left the mortgage in force. To strengthen the argument on this branch of the case complainant produced evidence tending to show that Thomas Holmes had for many years been tardy in meeting his obligations for farm and family expenses, and that in 1870 when Abiram went out into the world to act and operate in his own behalf, his father, as he subsequently informed a witness, "told Abiram he had better go if he wanted ever to do anything for himself: to start out now: 'Start out for yourself,' says he; 'I aint in a situation to do anything for you: I can't help you to a dollar, and you will have to start out: you might just as well go now as at any time and begin for yourself.'"

There is nothing in all this that brings home to Abiram a knowledge that his father in 1879 had an unpaid mortgage on his farm, or that fairly charges him with notice that such was probably the case. At most it would only apprise him that his father did not feel that, in addition to supporting his family and meeting his own obligations, he could spare anything to aid his son in getting started in the world. But the son, if he knew of the mortgage, might well refer this inability to the necessity he felt of paying it off. He might well agree with the father that such payment would be the father's first duty. And we find nothing in this record which fairly tends to show that when Abiram Holmes found the mortgage discharged of record, he was notified, either directly or by the circumstances, that the discharge was not made in consideration of payment, as it professed to be.

On the argument much stress was laid on the relationship between Thomas and Abiram, as raising a probability that the latter was fully apprised of his father's embarrassments. But if the relationship were to be accepted as the basis for a

legal presumption that a father laboring under pecuniary embarrassments would explain them to his children and keep them posted in respect to such embarrassments, such legal presumption would do violence to the facts in a great many cases, and would often result in gross injustice.  It is matter of common observation in the settlement of estates of deceased persons that the members of the family are surprised at the discovery of demands, liens and embarrassments of which they had before no knowledge and no suspicion. While a person in easy circumstances may delight to have his family understand and enjoy his prosperity in his life-time, and may therefore keep them fully informed concerning it, the man who is embarrassed is found very often to shrink from disclosure, even to his wife, and his own family may be more ignorant respecting his embarrassments than the community in general.  And for all that appears this may have been the case with Thomas Holmes.

But if we assume that Abiram Holmes knew of the origin and early history of the indebtedness to complainant, the assumption will fall far short of making out the necessary support to the complainant's case.  He would then have known that his father, the owner of a good farm worth five or six thousand dollars, contracted in 1860 an obligation to pay $1500, with seventy-five dollars every six months as interest thereon.  This was not a very serious burden, and the son might well suppose the father without difficulty would keep the interest paid.  He would know that the amount, even if the interest remained unpaid, could not in ten years be increased to $3700, or even to near that sum by any process which could be justified to the conscience; and when in 1879 he saw by the abstract that there had been a mortgage of $3700 on the land which was also discharged, there was nothing in the circumstances, as they are brought before us in this case, to charge him with knowledge or notice that so large a debt as $3700 had existed at the date of the mortgage.  It did not exist in fact, as we have seen; and when Abiram Holmes found the mortgage discharged of record, he was no more called upon to indulge in conjecture

how the discharge came to be made than he was to pry into
the reasons for so large a mortgage having been given. He
was no more bound to infer mistake in the discharge than
extortion and oppression in obtaining the mortgage; it was
enough for him, if he proposed to buy, that the party who
had taken a mortgage for more than was due him had dis-
charged it; and the reason for the large mortgage and the
reason for the discharge were alike immaterial. He had a
right, however, to suppose that complainant was a fair man
and would demand nothing but what was justly his due ; and
if he surmised that the parties for some unexplained reason
of their own had given and taken a mortgage for an excessive
amount but without any understanding or expectation that
more should be paid than was justly owing, the surmise
would not have been unnatural or unreasonable. He was
certainly not bound to assume or suspect that complainant had
taken advantage of his father's necessities to oppress him so
grossly as was intended.

Complainant in this case had the burden of proving notice
to Abiram Holmes not only that there was once a mortgage,
but that it was still in existence. The prima facie case was
all against him. The mortgage, by his voluntary act, was dis-
charged of record. The mortgagor, even if unthrifty, might
well have been supposed able to pay off the original indebt-
edness, and Abiram Holmes is not proved to have known of
any other. The mere fact, therefore, of Abiram Holmes
acting upon the proof of payment which the discharge would
afford, and which of itself was of the very highest nature, is
not suspicious. The fact that Thomas Holmes intended to
take advantage of the discharge to cut off the mortgage is
not proof that he disclosed the design to his son : on the
contrary he would naturally be careful to conceal it, lest by
the disclosure the design might be defeated. Complainant
attaches importance to the testimony of one Sheridan who
had been in the same employment with Abiram Holmes and
is supposed to have obtained damaging admissions. Accord-
ing to his statement, Sheridan was a stranger to complainant,
but was applied to a year before he gave his testimony, to

ascertain if he knew any facts favorable to complainant. But as he states it, it is plain he was expected to obtain admissions if possible. Complainant subsequently addressed him a letter, and he made this letter the pretext for making inquiries. Abiram, according to the witness, replied that "Mr. Sheldon was a regular old rascal, and made his money by swindling poor people out of it: he said we had him just where we wanted him." Confessions said to have been obtained in this way, especially pending litigation, are utterly unreliable, and are entitled to little or no consideration. It is not at all probable that Abiram Holmes, in response to an inquiry by one who apprised him at the time that he was in correspondence with the antagonist in a pending litigation, would make an admission which could be used by that antagonist as evidence. The very question, as the witness states it, would put him on his guard. But the response, if made as stated, has little significance. Abiram testifies positively that he had no knowledge of the discharge of the mortgage having been erroneous or inadvertent when he took his deed; and if he discovered all the facts afterwards, he would forfeit no rights by expressing, even in the strongest terms, his gratification that the extortion of complainant had through a blunder been defeated.

We find, therefore, that complainant has not made the necessary showing of notice in Abiram Holmes. The decree should therefore be reversed. It may be proper to add, however, that even if notice were proved, the decree ought not to stand. Complainant has come into a court of equity to obtain relief against the consequences of his own blunder for which none of the defendants was in any way responsible. When the bill was filed Abiram Holmes had done nothing which he was not legally and equitably entitled to do. He had simply taken a deed and given back a mortgage; and this he had a lawful right to do even if the mortgage of complainant was still a valid lien on the land. Complainant had no right, on the facts as they then stood, to put Abiram Holmes to the cost of correcting complainant's own error by suit in equity, but he should have taken some step

which put Abiram distinctly in the wrong before the latter could be chargeable with costs. But complainant was bound to do more than this : when he sought equity he was bound to do equity. If it was equitable to restore his mortgage, it was not equitable to do so for more than was justly due. In so far as he had obtained an unconscionable advantage, he should have been compelled, as a condition to relief, to accept the restoration of the mortgage with that advantage surrendered. The decree for more than nine thousand dollars, made up as it has been, is shocking to any just sense of equity. It is not enough for complainant to say the mortgagor consented to give the mortgage in question : that mortgage is discharged, and the parties do not consent to its restoration. Under such circumstances complainant invokes the aid of equity, and appeals to the conscience. To give him more than the original sum loaned, with interest computed thereon according to law, would not be equity and would not be sanctioned by an enlightened conscience.

The Court, however, is inclined to hold that as to any sums still owing by Abiram Holmes on his purchase at the time when, after making such purchase, he was notified of complainant's equities, said Holmes is not entitled to protection, and that complainant to that extent is entitled to foreclose his mortgage. This will give the defendant Abiram Holmes all the protection that is required by any rule of justice, and does not increase his liability, but only appropriates his subsequent payments to the party equitably entitled.

The decree must be reversed, with costs of this Court, and the cause remanded for further proceedings. A reference to determine the payments made by Abiram Holmes will probably be essential.

The other Justices concurred.