CHARLES FERGUSON v. GEORGE GLASSFORD ET AL.

*Mortgage—Discharge by mistake—Equity—Good-faith purchaser or incumbrancer—Notice.*

1. It is an elementary rule that equity will consider an incumbrance in force if the ends of justice can thereby be obtained.
2. Where a mortgage has been discharged from the record through mistake, it may be restored in equity, and given its original priority as a lien, when the rights of innocent third parties will not be affected.
3. A discharge upon the record of a mortgage is not an absolute bar to a foreclosure, unless there has been actual satisfaction. The facts still may be investigated. Such discharge of record is evidence of a high character, and sufficient to sustain the rights of all persons interested, unless the person setting up the discharged mortgage shall show some accident, mistake, or fraud, and this must be shown satisfactorily, and, if not, the discharge is conclusive proof of payment in favor of third persons, who have a right to look to the record for protection.
4. Purchasers or incumbrancers who become such after the discharge of mortgage is placed upon record are entitled to the same protection which the recording laws afford to subsequent purchasers and incumbrancers in good faith, as against unrecorded conveyances, who can be affected only by actual notice, or notice of such facts as should have put them upon inquiry.

5. When it is conceded that the discharge of a mortgage was placed upon record by mistake, and the testimony satisfactorily shows that the mortgage debt has not been paid, a purchaser of the premises covered by the mortgage, who is informed by the mortgagor that the mortgage is still outstanding and held by a person, naming him, is affected with notice that the discharge was recorded by mistake, and is not protected by an abstract showing the mortgage to have been discharged.[1]

Appeal from St. Clair. (Stevens, J.) Argued November 10, 1887. Decided January 5, 1888.

Bill filed to foreclose a mortgage alleged to have been discharged by mistake. Complainant appeals from decree dismissing bill. Reversed, and record remained for further proceedings in the execution of the decree. The facts are stated in the opinion.

*Mitchell & Wellman* (*Atkinson & Vance*, of counsel), for complainant.

*D. C. Walker* (*E. G. Stevenson*, of counsel), for defendant Glassford.

CHAMPLIN, J. In this case it is conceded that the written discharge of the mortgage bearing date the sixth day of January, 1879, executed by Archibald Maxwell and Ann Maxwell to John Allen, was placed upon record by mistake. The defendant George Glassford purchased the land from Maxwell on March 10, 1883, and the only question is whether he had actual notice that the mortgage was an existing incumbrance notwithstanding the record. To this question of fact most of the testimony was directed. The burden of proof was upon the complainant to establish the fact of notice; and to the better understanding of the testimony, a short history of the antecedent facts will be given.

On the sixth day of January, 1879, defendants Maxwell made, executed, and delivered to John Allen a note and

---

[1] Head-notes prepared by CHAMPLIN, J.

mortgage to secure the payment of $295 five years from that date, with ten per cent. interest. Afterwards Allen sold this note and mortgage to James Thompson. Prior thereto, and on the fifth day of December, 1877, the Maxwells made, executed, and delivered a note and mortgage to Charles Ferguson to secure the payment of $300, payable in three years from date, with interest at ten per cent. This note and mortgage was sold by Ferguson to the same Thompson, who afterwards died testate, and Zaddock Hallock and Charles Kennet, Jr., were appointed his executors, and qualified. Maxwell, not being able to meet these obligations as they should mature, arranged with the complainant, Ferguson, to purchase and hold them; agreeing to execute new mortgages, when they should mature, at a further length of time to pay. Ferguson accordingly purchased the notes and mortgages from the executors, which were delivered to him; but, instead of taking an assignment in the usual form, the executors executed formal discharges of the mortgages, and delivered them to Ferguson, to be held by him until the mortgages were paid, and then to be delivered as discharges. This unbusiness-like method was adopted to save the expense of drafting and recording two assignments. The expense of drafting and recording the assignments has been saved, but the expense of a chancery suit has not been saved, and the hazard of a total loss of his mortgage lien has been incurred. The Ferguson mortgage matured December 5, 1880, and was not paid.

On August 6, 1881, the defendants Maxwell executed a new mortgage to complainant, Ferguson, for $400. This mortgage was to take up the $300 mortgage, then past due, with the accrued interest, and some money at that time advanced to Maxwell. This mortgage was not recorded until the thirteenth day of December, 1881. The discharge of the Ferguson mortgage of $300 was not discharged of record until the ninth day of January, 1882, and the discharge

was effected by recording the discharge executed by the exec-
utors. Prior to this time, the other discharge executed by
the executors had been placed upon record, on the thirteenth
day of October, 1881. The recording of this discharge is
conceded to have been a mistake. The witnesses introduced
by complainant refer to the mortgage of $295 as the $300
mortgage.

Mr. Allen testified that, prior to the purchase of the farm
by Mr. Glassford, he had a conversation, in which he said to
Glassford that he had heard that Maxwell was offered $2,400
for his farm; that Glassford replied: "That is correct. I
am the man." On the sixth of March the defendant Glass-
ford was at Maxwell's place, and made him an offer for his
farm. The conversation was had both in the barn and in
the house, in the presence of several persons. All agree that
the agreement was that Glassford was to pay $1,650, and a
horse, valued in the trade at $150; and the point the wit-
nesses do not agree upon is the incumbrances he was to assume
and pay off. Maxwell and his wife both understood at that
time that Ferguson held the two mortgages,—one for $295,
and the mortgage for $400,—and they both regarded them as
existing liens upon the property; and at that time the
defendant Glassford knew nothing to the contrary. He had
not at that time examined the records, and the Maxwells were
not aware that a discharge of the $295 mortgage had been
recorded.

In examining the weight to be given the testimony of the
witnesses whose testimony conflicts, we must bear in mind
what at that time was the understanding of the Maxwells as
to the incumbrances then on the place, and the want of
knowledge of Glassford as to what incumbrances there were
upon it, or what the record showed. Maxwell testified that he
sold the place subject to the mortgages, which Glassford was
to pay as part of the purchase price; that he told Glassford
that there were two mortgages upon the place, both held by

Ferguson,—one for $300, and one for $400,—besides some back interest, making $700 which Glassford was to pay; that in his talk with Glassford he referred to the $295 mortgage as being a $300 mortgage. In this statement as to informing Glassford that there were two mortgages on the place, which he was to pay,—one of $300, and one of $400,—held by Mr. Ferguson, he is corroborated by Mrs. Ann Maxwell, his wife, Alexander Drummond, and John Drummond. They are contradicted by defendant Glassford, who testified:

"I then made him an offer of $1,650 and the white-faced mare; that was the first offer. Says he, 'No.' 'Well,' says I, 'I will make you one more offer, and I will never make you another. I will give you $1,650 and the white-faced mare, subject to that one mortgage, drawing eight per cent. interest.' He told me the amount of the mortgage, $400. He says, 'The place is yours.' And then we went to the house and we had our supper."

In this statement he is corroborated by George Lammerman, his son-in-law, who was also present on that occasion, who in his testimony also uses the expression "subject to that one mortgage."

If we strive to arrive at what was the bargain talked up at that time, we should place ourselves in the position the parties occupied, and consider the facts and surrounding circumstances. Maxwell understood that Ferguson held two mortgages,—one of $295, drawing 10 per cent. interest; and another of $400, drawing 8 per cent. interest. He was offering his farm for sale subject to the incumbrances. There is no reason why he should not include both mortgages in his offer, and the expression made use of by Glassford in his version contains within it a strong inference that he had been informed of an outstanding 10 per cent. mortgage, viz.: "Subject to that one mortgage, drawing eight per cent. interest." It must be borne in mind that neither of the parties at that time knew that the Allen mortgage had been discharged of record. It is likely that he was informed of all

the incumbrances there were on the place, or that Maxwell understood there were on the place.     Common prudence would have led Glassford to inquire as to the incumbrances.

It is not to be presumed that he would blindly pay the full value of the land, and leave incumbrances thereon which he might be called upon to discharge.   I conclude, therefore, that the probabilities are that Maxwell informed him of the fact that Ferguson held two mortgages, which were then liens upon the property.   Indeed, by Glassford's own testimony, Maxwell referred him to Ferguson to get his abstract, which Ferguson held, but he preferred to procure one himself.

Other corroborative testimony was introduced to prove notice.   One Lewis Presley testified that, two or three weeks after Glassford moved on the place, he told him that he paid in the neighborhood of $2,500 for the place, subject to a mortgage or mortgages amounting to $700; that he paid $1,650 in money, a mare worth $150, and there were two mortgages, amounting to $700, and some back interest.   Testimony was introduced tending to impeach this witness, and in the disposition of this case Presley's testimony may be laid out of view.

Alexander Drummond testified to a conversation which he had with Glassford before he purchased, in which he asked him what mortgages there were upon the place; and he told him all he knew about it was what Maxwell said, and that was that there was one of three hundred and one of four hundred dollars.   Glassford testified to having a conversation with Drummond, but says that Drummond told him he could get the place for $1,400, subject to the mortgage there was against it, and how much the mortgage was he did not say.   He also testified that, only a short time after that, the first offer he made Maxwell for his farm was $1,600, and then an offer of $1,650; and, when that was refused, he increased it by the offer of the white-faced mare, and the payment or assumption of the 8 per cent. mortgage.   If

Drummond told him he could get the place for $1,400, it is a little singular that his first offer should be $1,600. Testimony was introduced for the purpose of impeaching the witness Alexander Drummond by attacking his reputation for truth among his neighbors. I do not think they succeeded in doing so.

Charles Ferguson, the complainant, testified as follows:

"The first time I went to Mr. Glassford,—it was in the spring of the year after he got possession of the place,—I went to his place to see him about this mortgage,—to see what he was going to do about it; see whether he would pay it. And I asked him if he didn't want to pay it, and he said 'No;' that he had a bargain with Maxwell; that he said something about it expressed in the deed that he wasn't only to pay the one mortgage. I asked him if Maxwell didn't tell him about two. Well, he admitted that Maxwell told him that there was two mortgages, but he wouldn't take his word for it. He found on the records that one of them had been paid, and he said he made his bargain according to the abstract, and he wasn't going to pay the mortgage. Still, he admitted they told there was two, and it amounted to $700.

"At first Glassford admitted to me that Maxwell told him about the two mortgages of $700, but he was not going to take his word for it; the record was what he was going by. Glassford said he was not bound in law by what Maxwell said. He bought it according to the abstract. I told him he was in law bound by the information that Maxwell gave him about the two mortgages. He said he wasn't going to take Maxwell's word; he was going to go by the records. I said to him, if the mortgage was never recorded, he could not find it on the records. He said that the records was the only means of information he was bound by. After he went and searched, and found that one of the mortgages was discharged, he made a bargain to pay the mortgage according to the abstract, and that he was not bound by what Maxwell told him; he would not take no man's word."

After Glassford had made the verbal offer for the farm which had been accepted by Maxwell, he went to Port Huron, and procured an abstract of the title. This disclosed but one mortgage upon the premises; namely, that of $400, running

to Mr. Ferguson. This abstract bears date on the sixth of March, 1883.

On the tenth of March, 1883, the parties met in Mr. Walker's law office to have the deed prepared and trade closed. Mr. Glassford produced his abstract, and requested Mr. Walker to examine it, He did so, and pronounced the title in Maxwell, and incumbered only by a mortgage of $400 given by Maxwell to Ferguson.

Mr. Walker testified, in behalf of defendants, as follows:

" I will state that on the tenth day of March, 1883 (I should not be able to locate the date only by reference to the deed that I made on that day, and which I will introduce here), Mr. Glassford, the defendant here, and Mr. Maxwell, came to my office, and wanted to know if I was at leisure. I told him I was; and Mr. Glassford said, if this abstract is all right, they wanted a deed made, and produced this paper, which was called an abstract. I should judge from what they say they wasn't hardly able to figure it out to know exactly what it read, and they wanted me to examine it, and, if it was all right, they wanted a deed made. Then I took the abstract; run it through carefully. I told them that the title seemed to be straight in Mr. Maxwell; it passed through but one or two hands, and the title seemed to come straight to Maxwell; that Mr. Maxwell had given several mortgages, but they were all discharged except one of $400, drawing 8 per cent. interest, and read the date of that mortgage to both of them.

" Says I, ' Is that as both of you understand it?' and both assented to it, and says, 'If that is the shape of it, go on and draw the deed.' They came there alone. In drawing the deed, I saw it was a curious description,—'the south part;' but I had drawn some deeds before of fractional lands, and knew it was meandering. I saw it said in the abstract, 'supposed to be 100 acres.' Says I, 'Is that correct?' Mr. Maxwell says it is 128½ acres,—it had been surveyed and contained 128½ acres; so I placed that in there. They stated their bargain; how much he was to pay down, and that it was to be subject to that mortgage. They wanted to know how long it would take me to draw it. Says I, 'Not over half an hour.' Says I, 'Is your wife down here?' They said she was. Says I, 'You can go and get her, and probably by the time she gets here I will have the deed finished.' When she came in I had drawn up this deed, which I here offer in evidence, and

is marked in 'Exhibit 3.' They stated what the consideration was to be,—that he was to pay $1,800, and pay that
mortgage of $400, and interest; and something was said
about the interest. Says I, 'Is it all the interest from that
time, or has any of it been paid?' Maxwell said something
like this: If it is over a certain amount (I can't tell you
what it was) of interest,—I think he conveyed the idea he
had paid some interest on it, but, if it was over a certain
amount, he would make it good. 'Well,' says I, 'we will call
it subject to the amount of the mortgage.' I wasn't certain
whether he paid any or not. He made the remark, 'I have
paid at different times to Mr. Ferguson moneys, and I don't
know much of anything about it; only have trusted to his
honesty; have taken up a mortgage and given a new one,'
etc.

"No allusion was made at that time in their instructions
to me, nothing said about any other mortgage than the one
that was said; and that was all that was said in relation to
the consideration. I drew the deed according to those
instructions, and, before I had got quite through with it, Mrs.
Maxwell and some others (I can't identify them, but two or
three), came in, and they both said they didn't write; so I
had them, after reading it to them carefully, so there should
be no mistake about it. I read it carefully to them, and
distinctly, and no objection was made to it. Says I, 'If
it is right, sign it.' They said, 'We make our marks; we
don't either of us write our names.' I knew Mr. Maxwell
didn't before, but I didn't know as to his wife. Mr. Glassford (I can't say whether that was in the first conversation,
or after returning in there) says, 'I shan't pay any money
over until I know that nothing has taken place since that
abstract was made.' Well, I rather laughed at the idea.
Says I, 'I don't think there is any danger in you paying
over your money.' 'Well,' says he, 'it is all the money I
have; I don't want to hazard it at all.' Says he, 'I have
known of deeds and mortgages to be made and put on record before another deed that should have gone on record
first,'—something of that kind. He alludes to a transaction
of that kind; and says he, 'I will put the money in any one's
hands to keep until I can go down, and see whether anything
else has gone on since that abstract was made;' and I don't
know whether Mr. Broker was spoken of or not, but he
was sent for, and came in, and the money was counted out,
$1,650, corresponded to the amount, reckoning the horse
$150, named in the consideraton ; and it was warranted to

be free and clear of all incumbrances except the mortgage of $400, bearing such a date as the agreement on Glassford's part to pay that which he assumed and agreed to pay; and Mr. Broker came in and witnessed the instrument, and witnessed the putting of the marks there, and took the money; and Mr. Glassford said he would go to Port Huron, and, if it was all right, he would telegraph right to us, so they could get the money that day and go home. That is all I know about it. Mr. Broker came in before I had got quite completed; he came in about the time I had commenced to read it before it was signed. I think all of them had left while I was making the deed, and I sat there at my desk and wrote it alone; but a number of them came in before I got it complete, and there was no conversation,—they all sat still there. I said to them, ' I have got this nearly finished;' and nothing was said until it was done, and I read it, and it was signed, and the money counted out and given to Broker."

The testimony of Mr. Walker is given in full, as the defendants place great reliance upon it, as tending to establish the entire want of knowledge or information that there were two mortgages upon the premises at the time of sale. It may be granted that Mr. Walker states what occurred and was said in his office with entire accuracy; and yet it is consistent with the fact that, when Glassford made the verbal agreement at Maxwell's on the Monday before, he was informed that Ferguson held two mortgages against the place, —one for three hundred and another for four hundred dollars. Nothing was said in his presence relative to any previous talk between the parties. The most that can be said from his testimony is that, had there been no previous colloquy between Glassford and Maxwell, there was nothing in what was said or done in his presence that would tend to prove that Glassford had actual notice that the $300 mortgage was still an existing incumbrance upon the property. There were present, before the deed was finally executed, Mr. Walker, Mr. Glassford, the brother of defendant, Mr. Maxwell, his wife, Ann Maxwell, Mrs. Hoffman, Sidney Broker, and defendant Glassford. Mr. and Mrs. Maxwell and Mrs.

Hoffman each testified that both mortgages were mentioned on that occasion, and the other persons named testified that only the $400 mortgage was mentioned.

We may conclude that the mortgage in dispute was not there mentioned; still, from a consideration of the whole testimony, and the impression it makes upon my mind, I cannot escape the conviction that defendant Glassford had information which, at the least, should have put an ordinarily prudent man upon inquiry that Ferguson held two mortgages upon the premises, and such information as amounted to actual notice of the existence of the mortgage in question. The testimony introduced tended to show that the farm was worth $2,500, and I do not understand that this evidence is contradicted by defendant Glassford; and this fact has a bearing upon the probabilities regarding the question of his being informed of the two mortgages, aggregating $700.

It is an elementary rule that equity will consider an incumbrance in force if the ends of justice can thereby be obtained. *Lowrey v. Byers,* 80 Ind. 443. And, where a mortgage has been discharged from the record through mistake, it may be restored in equity, and given its original priority as a lien, when the rights of innocent third parties will not be affected. *Sidener v. Pavey,* 77 Ind. 241; *Hanlon v. Doherty,* 109 Id. 37 (9 N. E. Rep. 782).

The courts of New Jersey hold, and I think correctly, that the simple cancellation of a mortgage on the record is not an absolute bar to a foreclosure, unless there has been actual satisfaction. It is not conclusive evidence. The facts may still be investigated. But it is evidence of a high character, and sufficient to sustain the rights of all persons interested, unless the party setting up the discharged mortgage shall show some accident, mistake, or fraud, and this must be shown satisfactorily on his part. If not so shown, the discharge is conclusive proof of the payment, especially in favor of third persons, who have a right to look to the record for

protection. *Banta v. Vreeland*, 15 N. J. Eq. 103, 107; *Freeholders of Middlesex v. Thomas*, 20 Id. 42; *Harrison v. Railroad Co.*, 19 Id. 488; Jones, Mort. (3d ed.) § 966; *Trenton Banking Co. v. Woodruff*, 2 N. J. Eq. 117; *Lilly v. Quick*, Id 97; *Miller v. Wack*, 1 Id. 214.

In *Trenton Banking Co. v. Woodruff, supra,* the court said:

"It has been settled in this court that the cancellation of a mortgage on the record is only *prima facie* evidence of its discharge, and leaves it open to the party making such allegation to prove that it was made by accident, mistake, or fraud. On such proof being made, the mortgage will be established, even against subsequent mortgagees without notice;" citing *Miller v. Wack* and *Lilly v. Quick*.

The statement as laid down is too broad. What the learned court meant by subsequent mortgagees were those who were subsequent to the mortgage which was discharged, but who became mortgagees before the discharge was placed upon record. This is evident from the cases cited by the court. If they become mortgagees or purchasers after the discharge is placed upon record, they are entitled to the same protection which the recording laws afford to subsequent purchasers and incumbrancers in good faith, as against unrecorded conveyances, who can be affected only by actual notice, or notice of such facts as should have put them upon inquiry. The rule was applied by this Court in *Sheldon v. Holmes*, 58 Mich. 138 (24 N. W. Rep. 795). In this case it is conceded that the discharge of the mortgage in question was placed upon record by mistake. The mortgage, then, appears to be an existing lien as between the parties, and those in privity with them, with notice that the holder claimed it to be an existing lien.

My conclusion from the whole testimony, disregarding the testimony of the witnesses claimed to have been impeached, is that defendant Glassford had such notice. It follows that

the decree of the court below must be reversed, and a decree made in accordance with the prayer of the bill.

The complainant having, by his negligent method of doing business, made it necessary to resort to these proceedings, will not recover any costs in this Court, and neither party will recover costs in the court below.

The record will be remanded to the circuit court for the county of St. Clair for further proceedings in the execution of the decree.

SHERWOOD, C. J., and MORSE, J., concurred. CAMPBELL, J., did not sit.