E. B. MILLAR & COMPANY (A CORPORATION) v. CHARLES
E. OLNEY AND JOHN G. SHIELDS ET AL.

*Chattel mortgage — Failure to file — Good faith of subsequent
incumbrancer—Notice.*

1. This Court has never held that the mere failure of a creditor, at
   time of taking a mortgage, to inquire of the debtor as to *prior*
   (unrecorded) incumbrances or conveyances, will charge such
   creditor with *notice* of their existence.

   So *held*, where debtors sent for certain creditors, whom they
   had promised to secure in case of financial embarrassment, at
   ten o'clock at night, and told them that they were liable to have
   trouble, and wanted to give them a chattel mortgage on their
   stock of goods, which was done, and the mortgage recorded
   early the next morning, soon after which a *prior* mortgage exe-
   cuted on the same day was recorded, of which the subsequent
   mortgagees had no *knowledge* at time of taking their security,
   but made no inquiry of the mortgagors as to *prior* incum-
   brances, their mortgage containing, however, a covenant against
   such liens.

2. Where the *fact* of a *prior* conveyance or incumbrance is brought
   to the *knowledge* of a subsequent purchaser or incumbrancer, he
   must be held to take subject thereto, or, when such circum-
   stances are shown to have existed as would put an ordinarily
   prudent business man upon inquiry, he is charged with *notice* of
   such facts as upon inquiry he could have ascertained; but where
   circumstances *alone* are relied on, with no proof of *actual*
   knowledge, they must be of such a character that failure to
   make the inquiry amounts to bad faith. *Larzelere v. Stark-
   weather,* 38 Mich. 96; *Sheldon v. Holmes,* 58 Id. 138; *Oliver v.
   Sanborn,* 60 Id. 346; *Ferguson v. Glassford,* 68 Id. 36.

3. Mere suspicion or supposition by creditors, at time of taking a
   mortgage upon their debtor's stock of goods, that he was finan-
   cially embarrassed, or that he expected attachment suits, will
   not constitute notice of a prior unrecorded mortgage on said
   stock, so as to give a right of action to such prior mortgagees.

Error to Kent.   (Montgomery, J.)   Argued April 4, 1888.
Decided April 20, 1888.

Trover. Defendants bring error. Reversed. The facts are stated in the opinion.

*Earle & Hyde,* for appellants.
*Turner & Carroll,* for plaintiff.

LONG, J. This was an action of trover, brought by the plaintiff against the defendants, to recover the value of the interest that they claim to have by virtue of a certain chattel mortgage in a stock of goods situate in the city of Grand Rapids.

The defendants Olney and Shields claimed that they legally held possession of said stock by virtue of a certain chattel mortgage given them by the owners thereof, and who were the mortgagors in the chattel mortgage of the plaintiff. It is a controversy between a subsequent mortgagee from a common mortgagor, who has placed his mortgage on record, and a party claiming under a prior unrecorded mortgage.

The defendant Joseph Hartman was not served with process, and did not appear in the case, and the plaintiff submitted to a nonsuit as to defendant Abbie Antrim upon the trial; so the controversy is entirely between the plaintiff and the defendants Olney and Shields.

On the trial, the plaintiff recovered a verdict of $735.49, upon which judgment was entered.

The assignments of error of defendants Olney and Shields are directed entirely to the refusal of the court to charge as requested in their several requests, and to certain portions of the charge as given by the court on its own motion.

The facts in the case are, as claimed by defendants' counsel, substantially as follows:

The plaintiff was a wholesale trading corporation, doing business in Chicago, and selling teas, coffees, spices, etc.

Hartman & Antrim were partners, engaged in the same business at retail in the city of Grand Rapids, and their store was known as the "Japan Tea Company."

The plaintiff had long before this been selling Hartman & Antrim goods, so that on the twelfth day of May, 1887, Hartman & Antrim owed the plaintiff $717.73.

On this day Mr. Hartman was in the plaintiff's store in Chicago, and, in order to secure the payment of this sum to the plaintiff, then and there executed and delivered to the plaintiff, in the name of his firm, a chattel mortgage for said sum of $717.73 on all the stock, fixtures, and other property belonging to their business in Grand Rapids.

This mortgage was executed at noon of said twelfth day of May, 1887, and the plaintiff at once mailed it in an envelope, stamped with a special delivery stamp, to Messrs. Turner & Carroll, attorneys at Grand Rapids, with a request that they file the same in the office of the city clerk of Grand Rapids.

Prior to this, Olney, Shields & Co., a wholesale grocery firm of Grand Rapids, and of which firm the said defendants Olney and Shields were members, had been selling to said Hartman & Antrim goods from day to day, mostly at 30 and 60 days' time, comprising a large number of transactions, on which Hartman & Antrim paid them moneys along; so that on said twelfth day of May, 1887, Hartman & Antrim were owing Olney, Shields & Co., $747.76, the greater part of which was then due and payable.

Defendant Shields testified upon the trial, and was undisputed, that at different times while their firm were selling goods to Hartman & Antrim, and prior to said twelfth day of May, both Hartman and Antrim had repeatedly told them that Olney and Shields should never lose anything by them; that they would pay their account; and if they ever got hard up, or in any financial trouble, and their creditors were pressing them, that they would secure and protect Olney, Shields & Co., so that they would not be the losers.

During the evening of said twelfth day of May, at about 10 o'clock, Mr. Shields was called up at his house by telephone from the law-office of Mr. Larry Carroll, in Grand

Rapids, and asked to come down at once to his office, as Hartman and Antrim were there, and wanted to see him in reference to the balance they were owing to Olney, Shields & Co. Mr. Hartman had returned from Chicago that afternoon, reaching Grand Rapids about 9:45 in the evening.

Mr. Shields, in response to this message, went to the office of Mr. Carroll, and there met Carroll, Hartman, and Antrim.

Mr. Shields testified, and his testimony is undisputed, that he—

"Immediately asked them what was the matter, having had no intimation whatever of any trouble heretofore, and having sold them goods right along from day to day as they called for them. They told me they were liable to have some trouble, and, inasmuch as they had always told us that they would take care of us in any case of this kind, they wanted to secure us by giving us a chattel mortgage. I asked them whether I could not help them some by advancing them money to tide them over their difficulty, whatever it might be or help them out by giving them a larger line of credit; but their answer was that they thought we had better take the mortgage; that they didn't know whether they could be able to carry on business much longer; and of course we were anxious to have our account secured."

Mr. Hartman then said they had borrowed $318 of his father, and Mr. Antrim said they had borrowed $200 from his mother, and they wanted to secure, also, both of these amounts by chattel mortgages; that there was some $2,000 in goods in their store; and the mortgage to Olney, Shields & Co. was to be made subject to these two small mortgages. These three mortgages were then and there drawn; but before full execution they all went down to the store of Olney, Shields & Co. in order to ascertain from the ledger the exact amount of the balance due and owing by Hartman & Antrim to them, which was there ascertained to be $747.76. This amount was inserted in the Olney, Shields & Co. mortgage, and a note was at that time made by Hartman & Antrim to

Olney, Shields & Co. for said amount, dated May 12, 1887, and due one day after date.

The note and the three chattel mortgages were then delivered to Mr. Shields, to be by him filed in the office of the city clerk of Grand Rapids. All three of these mortgages covered all the stock of goods, fixtures, etc., of Hartman & Antrim at their store in Grand Rapids, and were upon the same goods and fixtures covered by plaintiff's mortgage.

The stock, goods, and fixtures were worth more than the amount of the plaintiff's mortgage, which mortgage covered also a horse, wagon, and other property, not included in defendants' mortgage; but this extra property was only of the value of from $120 to $250, and, as the judgment was for $735.49, the property in the plaintiff's mortgage, and not included in defendants,' constitutes no element in the case.

The next morning after these various transactions, being the morning of the thirteenth of May, 1887, Mr. Shields left his home at a little before 7 o'clock, which was about his usual time of going to his store, and on his way down town stopped at the city clerk's office to file these three mortgages. He found the office still closed, but after waiting a few minutes it was opened, and the mortgages were then filed by the city clerk at 7 o'clock and 5 minutes.

About 9 o'clock of the same morning, Messrs. Turner & Carroll, attorneys at Grand Rapids, received through the mail the mortgage of the plaintiff, which had been mailed by it from Chicago to them the afternoon before. Mr. Carroll, of that firm, at once took it to the office of the city clerk, and filed it about half past 9 o'clock, when he learned of the three mortgages above described. Mr. Carroll then saw Mr. Shields, and claimed that plaintiff's mortgage was entitled to precedence over the mortgage of Olney, Shields & Co. The latter firm had taken possession of the stock of goods covered by

their mortgage, and Mr. Carroll demanded them, upon plaintiff's mortgage, of Olney, Shields & Co., who refused to deliver the same to plaintiff.

The contention of the plaintiff is that its mortgage was received by it prior to the making of the defendants' mortgage; and that although the latter mortgage was first filed, and even though the defendants Olney and Shields had no *actual* knowledge of the existence of plaintiff's mortgage when they took and filed theirs, still the mortgage of Olney, Shields & Co. was taken by them under such circumstances as amounted to notice of plaintiff's mortgage, so that Olney, Shields & Co. are not *bona fide* mortgagees. That is, plaintiff claims that the facts and circumstances in this case under which Olney, Shields & Co. took their mortgage were such as would excite the suspicion of an ordinarily prudent man, and put him upon inquiry; so that defendants, under the peculiar facts of this case, were bound to make inquiry about the state of title of the Hartman & Antrim stock, and, if they had thereupon made inquiry, they would have ascertained the existence of the plaintiff's mortgage.

On the other hand, the defendants Olney and Shields claim the circumstances surrounding the taking of their mortgage were not such as to give them implied notice of plaintiff's mortgage, and that they are *bona fide* first mortgagees.

The testimony was undisputed that neither Olney nor Shields, nor any member of their firm, had any actual knowledge of plaintiff's mortgage until after they had filed their mortgage on the morning of May 13.

The record contains all the evidence given on the trial concerning the giving of the mortgage to Olney, Shields & Co., and in reference to the knowledge or notice that they had of plaintiff's mortgage at the time they filed theirs.

After the testimony was closed, defendants' counsel requested the court to charge the jury as follows:

"5. Mere suspicion or supposition by Olney, Shields &. Co., when they took their mortgage, that Hartman & Antrim were financially embarrassed, or expected attachment suits, would not constitute notice of plaintiff's mortgage, so as to give them a right of action against the defendants Olney and Shields.

"6. There is no evidence tending to show that defendants Olney and Shields had notice of plaintiff's mortgage at the time of the filing of the mortgage of Olney, Shields & Co.; and, as to the property covered by the mortgage of Olney, Shields & Co., the plaintiffs have no right of action."

These requests the court refused to give in charge to the jury, and upon such refusal the defendants base their first, second, third, and seventh assignments of error.

This raises the principal question in the case. The court, in its general charge upon this part of the case, said:

"What, then, constitutes a subsequent mortgagee a mortgagee in good faith, within the meaning of this rule? That, then, gentlemen, is the first important question in this case.

"The mortgagee must part with some consideration, in order to be a mortgagee in good faith. I charge you, for the purposes of this case, the extension of time was a sufficient consideration, so that Olney, Shields & Co. would be mortgagees in good faith, unless it is shown that the defendants, or some one of them, had knowledge of the mortgage, or had knowledge or information of such facts as would lead an ordinarily prudent business man to make inquiry as to what had been done by Hartman & Antrim to incumber their property. If the mortgagees, or Shields, who acted for the mortgagees, had notice of the prior mortgage, or knowledge of, or information of, sufficient facts to put an ordinarily prudent man on his guard, and lead him to make inquiry as to the real facts in the case, then they were not mortgagees in good faith. One cannot claim to be a mortgagee in good faith if, at the time of taking his mortgage, he purposely desists from making inquiry, if there are sufficient facts before him to put an ordinarily prudent man upon such inquiry."

In another part of his charge the court said:

"The question is a question of fact. It is for you to say whether, under the circumstances of this case, situated as

these parties were, and as Mr. Shields was, with the information which he had before him at the time,—whether the part of prudence required of him, as an ordinarily prudent man, that he should make inquiry to ascertain whether this property was or was not incumbered. If you find that that was his duty as an ordinarily prudent man, he was not a *bona fide* purchaser in good faith, within the meaning of the statute. If you find that it was not, he would not be bound to take notice upon facts which would simply lead to the impression that there might be some danger of attachment, or something of that character,—some future incumbrance. But if you find that there was sufficient to indicate to an ordinarily prudent man that there might be, and probably was, an incumbrance existing on this property, it then became his duty to make inquiry; and he could not, under those circumstances, become a *bona fide* purchaser in good faith; and then their mortgage, having been executed prior thereto, would be entitled to priority. It is a question for you to determine, in your best judgment, on the evidence in the case."

An examination of another portion of the charge will show upon what testimony the court based this instruction. In referring to the circumstances surrounding the taking of the mortgage, and the testimony bearing upon that part of the case, the court said:

"In determining this question, the jury should take into account the circumstances under which this mortgage was made. They are at liberty to take into consideration the facts in the case as shown by the evidence; and if they find, from the evidence, that Mr. Shields was called on late at night to go to an attorney's office, where he found Hartman and Antrim, who told him they were in trouble, and wanted to give a mortgage to his firm on their stock, and he purposely desisted from making inquiries which an ordinarily prudent man, under such circumstances, called upon to make an advance or to receive a mortgage on said stock for some valuable consideration passing from him, would have made, these defendants cannot claim to be *bona fide* purchasers, so as to give their mortgage priority over that of plaintiff."

The examination of defendant Shields, who took the mortgage, shows conclusively, and it is admitted by the record, that no member of the firm of Olney, Shields & Co. had any

knowledge or information of the existence of plaintiff's mortgage until the morning of the thirteenth of May, and some hours after the filing of the Olney and Shields mortgage.

Mr. Larry Carroll, the attorney who drew the mortgage, corroborates Shields in his testimony as to what took place at Carroll's office at the time the mortgage was drawn.

It appears from the testimony of J. A. Morrison, one of the members of the firm of Olney, Shields & Co., that on the morning of May 13, after the filing of the Olney, Shields & Co. mortgage, he met Mr. Hartman, who then told him of the making of the plaintiff's mortgage, and requested the witness not to say anything to Shields about it; that he did not know for what object; that he wanted to tell him himself. As shown by the record this was the first information that any member of the firm had of the existence of the plaintiff's mortgage. It is not shown that Olney or Shields, or any member of the firm, had any knowledge or information that Hartman & Antrim were indebted to plaintiff, or that Hartman had been to Chicago, and there had an interview with plaintiff.

The only circumstances as shown by the testimony upon which the plaintiff relies to charge the defendants with knowledge or information of its mortgage, or that ought to have put Shields upon inquiry, so as to charge him with notice, are that he was called upon at 10 o'clock at night to go to Carroll's office to meet Hartman and Antrim, the mortgagors in the mortgages, who told him they were liable to have some trouble, and wanted to give him a chattel mortgage, and that Shields did not at that time inquire of them if they had given any mortgages upon their stock, or if the stock was in any way incumbered; and plaintiff's counsel argue—

"That the fact that Shields failed to make this inquiry is evidence from which the jury might infer that he purposely

abstained from making it, so that he might not be charged with actual notice of prior incumbrances, and that, had he made the inquiry, the jury must infer that Hartman & Antrim would then have disclosed to him the fact of plaintiff's mortgage."

The undoubted rule is that where a party taking a subsequent conveyance or mortgage receives direct and express notice that a certain other party holds a prior mortgage or other lien upon the property included in such subsequent conveyance, or if such prior mortgagee or grantee is in possession of the property conveyed, or if such prior mortgage or conveyance has been recorded, it is sufficient to put such subsequent mortgagee or grantee upon inquiry as to the extent of the claim or lien of such prior mortgagee or grantee, and in that case he would take subject to such prior lien.

It is also well settled that if one has knowledge or information of such facts as would lead an ordinarily prudent business man to make inquiry as to the rights of others in the property which he is about to purchase, or upon which he proposes to take security, he must be charged with notice of such facts as such inquiry would have discovered. *Oliver v. Sanborn*, 60 Mich. 346 (27 N. W. Rep. 527); *Sheldon v. Holmes*, 58 Id. 138 (24 N. W. Rep. 795); *Ferguson v. Glassford*, 68 Id. 36 (35 N. W. Rep. 820).

This Court has never gone to the extent that, solely upon failure to inquire of the mortgagor as to prior incumbrances or prior conveyances, one is to be charged with notice of such incumbrances or conveyances; and we are aware of no case in any court that holds to this doctrine.

The extent to which the cases have gone is that, where the fact of a prior conveyance or incumbrance is brought to the knowledge of the subsequent purchaser or incumbrancer, he must be held to take subject to such prior conveyance or incumbrance, or, when such circumstances are shown to exist

as would put an ordinarily prudent business man upon inquiry as to such prior conveyance or incumbrance, then he is charged with notice of such facts as upon inquiry he could have ascertained; but where circumstances alone are relied upon, with no proof of actual knowledge, they must be of such character that failure to make the inquiry amounts to bad faith.

In *Larzelere v. Starkweather*, 38 Mich. 96, 107, it was said:

" There are cases which go very far in extending the doctrine of laches in applying the rule of constructive notice. We think, however, the better, and certainly the safer, rule to be that a mere want of caution is not sufficient; not that he had incautiously neglected to make inquiries, but that he had designedly abstained from making inquiry for the very purpose of avoiding knowledge."

In the present case no claim is made that Shields or any of the defendants ever heard of plaintiff as a creditor or incumbrancer, or ever had the least intimation or hint from any source that this property was incumbered, or that they were not to have the first lien thereon, subject to the other two small mortgages, or that any person had, or claimed to have, any interest therein, except Hartman & Antrim. The fact that Hartman & Antrim were being pressed by their creditors, and feared trouble, would not necessarily lead one to the conclusion that they had already incumbered the property; but, on the contrary, from the circumstances here stated, the natural conclusion would have been that they were anxious to give Olney, Shields & Co. a claim prior to all other creditors; and the fact testified to by Mr. Shields, " that Hartman & Antrim promised them in case of any trouble they would protect them," would naturally lead his mind to the conclusion that this was the very purpose of getting him to Carroll's office at that time in the evening.

Another fact appears in the case that has some weight. The mortgage contains the following clause:

" Which said above-described goods, chattels, and property, at the date hereof, are situate at and in the store aforesaid, in the city of Grand Rapids, county of Kent, Michigan, and are free and clear from all liens, conveyances, incumbrances, and levies, except two certain mortgages of $300 and $200, respectively; and, for valuable consideration, we hereby warrant the above representation to be true."

Here is a direct and positive statement from Hartman & Antrim that there was no other incumbrance on the property; and this recital in the mortgage, coupled with the statement made by Hartman, the next morning after its execution, to Morrison, one of the firm of Olney, Shields & Co., "not to say anything to Shields about plaintiff's mortgage, as he would tell him himself," shows that Hartman & Antrim purposely concealed from Shields the existence of plaintiff's mortgage; and it is not to be presumed from the circumstances here stated that they would have disclosed the existence of the plaintiff's mortgage had Shields made inquiry about prior incumbrances; and we do not think it at all a suspicious circumstance that Shields was called to meet Hartman and Antrim at 10 o'clock at night.

That Hartman & Antrim intended to give Olney, Shields & Co. an advantage over plaintiff could not affect the rights of defendants.

As the case is presented by this record, we think the court was in error in its general charge, and that defendants were entitled, under the circumstances, to have had their fifth and sixth requests given in charge to the jury.

We are of the opinion that there is nothing shown in this case that would have put an ordinarily prudent business man on inquiry, and that there was no question of fact to go to the jury for a finding upon this part of the case. This must necessarily dispose of the case here, and we need not discuss the other questions raised.

The judgment must be reversed, with costs, and a new trial ordered.

SHERWOOD, C. J., and CHAMPLIN and MORSE, JJ., concurred.