[No. 25292. Department Two. December 21, 1934.]

CHRISTIAN TJOSEVIG *et al., Appellants,* v. J. D. BUTLER *et al., Respondents.*[1]

_____
[1] Reported in 38 P. (2d) 1022.

*Oscar A. Zabel,* for appellants.

*Poe, Falknor, Falknor & Emory,* for respondents.

STEINERT, J.—This is an action against the directors of a corporation to recover damages for fraud alleged to have been committed by its officers in the sale of its preferred stock to plaintiffs. At the close of plaintiffs' evidence, certain of the defendants were dismissed from the case. At the conclusion of all the evidence, the court granted a motion challenging its sufficiency to sustain any verdict for plaintiffs against any of the defendants. From a judgment dismissing the entire action, plaintiffs have appealed.

The essential facts are these: Sometime prior to 1913, Mr. F. J. Martin organized, and became president of, Northwestern Mutual Fire Insurance Association of Seattle. Being vitally interested in matters affecting the reduction of fire losses, Mr. Martin gave considerable attention to the securing of any devices that might be of aid in preventing, or else of minimizing, waste through fires. Learning of an automatic fire-alarm device that had been patented by George Lawrence Smith, of Great Britain, Mr. Martin made a trip to see Mr. Smith, and succeeded in getting from him a contract running to Aero Fire Alarm Company, a corporation organized under the laws of New Jersey, whereby that company obtained the exclusive rights to manufacture and dispose of, throughout the United States excepting the state of Colorado, automatic fire alarms made in accordance with the invention as described in Mr. Smith's patent rights.

On June 9, 1913, another corporation bearing the name of Aero Fire Alarm Company was organized under the laws of the state of Maine. On the day fol-

lowing, the New Jersey corporation conveyed all its assets to the Maine corporation, of which Mr. Martin was made president at the same time. The new invention immediately became very popular because of its usefulness and the consequent reduction in insurance rates effected by it. The business of the company grew rapidly from the very start, and gave promise of extraordinary possibilities. Contracts for installing its system, which included the automatic device, were obtained to the extent of many thousands of dollars. Among these were contracts with the United States government, Panama Pacific Exposition Company of San Francisco, a number of railroad and steamship companies, and many other large concerns throughout the United States, particularly in the northwest. The company's main assembly plant was located at Plainfield, New Jersey. In addition to that, it also had factories or plants in one or two other cities.

It later became apparent to the officers of the Maine company that some means would have to be devised in order to obtain sufficient capital with which to expand and operate the constantly growing business. Accordingly, Mr. Martin, in 1916, organized Aero Alarm Company, under the laws of the state of Washington, with its principal place of business in Seattle, and having a capital stock of five million dollars, divided into one hundred and twenty thousand shares of common stock of the par value of twenty-five dollars each, or a total of three million dollars, and twenty thousand shares of preferred stock of the par value of one hundred dollars each, or a total of two million dollars. The preferred stock had no voting power, and was subject to retirement after five years, upon the payment of one hundred and fifteen dollars per share.

The two companies, Aero Fire Alarm Company of Maine and Aero Alarm Company of Washington, then

entered upon a mutual campaign for selling the preferred stock of the latter company to the investing public. With this in view, Aero Fire Alarm Company, on July 16, 1917, entered into a contract with Magnus G. Thomle of Seattle, whereby the latter was to sell for the company one thousand shares of Aero Alarm Company's preferred stock, for which Thomle was to receive a commission of seven per cent of all cash sales and a bonus of one share of common stock for each share of preferred stock sold by him. The contract further provided that Thomle should use only such literature as was supplied to him by Aero Fire Alarm Company. Pursuant to his employment, Mr. Thomle entered upon a vigorous sales campaign, and in connection therewith published advertisements concerning the stock in WASHINGTON POSTEN, a newspaper printed in the Norwegian language.

At this point, the appellants enter into the case. Christian Tjosevig and Eli Tjosevig are Norwegians by birth. Mr. Tjosevig was about forty-nine years of age at the time of making the stock purchases involved in this action. The Tjosevigs had five daughters, one of whom was appellant Christine Tjosevig, who, at the time of the initial purchase, was about seven years of age. Another daughter was Dagney Marie Tjosevig, who at that time was about ten years of age. Chitna Investment Company was, and is, a corporation wholly owned and controlled by Mr. and Mrs. Tjosevig.

On October 3, 1917, Mr. Tjosevig, having read an advertisement in WASHINGTON POSTEN, and having also seen some of the company's circulars, purchased ten shares of the preferred stock of Aero Alarm Company for each of his daughters Christine and Dagney. This purchase appears to have been made from funds which Mr. and Mrs. Tjosevig had previously set aside for the education of the two daughters. On June 18, 1918,

Mr. Tjosevig purchased one hundred shares of the stock for Chitna Investment Company, and on February 5, 1919, purchased twenty-five additional shares for the same company.

Aero Alarm Company, the Washington corporation, paid quarterly dividends on its preferred stock until about 1923, but has not paid any since that time, although its volume of business appears to have steadily increased for some years thereafter. In most instances, the company would install and operate its fire-alarm equipment and facilities on the premises of its customers, on a lease or rental basis. In some instances, however, it sold the equipment outright to the customer. The business necessitated a vast amount of capital, and the continuous outlay of money was what probably prevented further declaration of dividends. A large bond issue was finally floated, maturing in 1930.

When the payment of dividends ceased, Mr. Tjosevig evidenced a very keen interest in the status of the above investments made by him. He frequently called at the company's office, conferred with its officers, and insisted upon examining its books and records, a privilege that was regularly accorded to him. However, he was very much dissatisfied with conditions, and upon frequent occasion gave expression to his dissatisfaction. Finally, on February 18, 1926, Mrs. Tjosevig, as guardian for her daughter Dagney, instituted suit against Aero Alarm Company, Mr. Martin and a number of the respondents herein, to recover the redemption value of Dagney's stock and also certain unpaid dividends. While this suit was pending, Mr. Tjosevig wrote a letter to Mr. Martin stating that he had recently photographed the building in which the company's plant was located at Plainfield, New Jersey, and that he had learned that it was assessed at a little over five thousand dollars, whereas the *plants* which

the company was supposed to own had been represented to him as being worth over four hundred thousand dollars. Four days later, the complaint in the then pending action was amended to include the principal allegations of fraud relied on in the present action. On May 9, 1928, that action was dismissed by order of the superior court. It is well to note here that the present action was not commenced until December 28, 1931.

On May 18, 1928, at the instance of Mr. Tjosevig, a second action was begun by Mrs. Tjosevig, as guardian of her daughter Dagney, against the same parties and based upon the same charges as those contained in the amended complaint in the first action. The result of that action was that, on November 23, 1928, after a trial and verdict for the plaintiff therein, the court entered judgment for defendants notwithstanding the verdict. At this point, it will again be noted that the present action was not commenced until December 28, 1931.

As a result of the depression commencing in 1929, and of the demands made upon the company by its bondholders, Aero Alarm Company went into bankruptcy in 1931. Its assets were sold by the trustee in bankruptcy for one million, one hundred thousand dollars, which amount, however, was insufficient to pay the company's indebtedness. The preferred stock of the company was, therefore, valueless, and any action against the company itself would, of course, have been futile. This action was, therefore, begun against the directors of Aero Alarm Company.

The complaint consists of two causes of action, one asserted by Mr. and Mrs. Tjosevig and Chitna Investment Company, and the other by Christine Tjosevig. The allegations of both causes are the same, except for the amounts sought to be recovered. The charges

of fraud are as follows: (1) In publishing in the WASHINGTON POSTEN an advertisement containing a false statement to the effect that A. S. Taylor was one of the managers and trustees of the corporation; (2) in publishing in the same paper a false advertisement to the effect that the purchaser of the preferred stock could deliver it to the corporation after five years from date of purchase, and that the company would then redeem it at one hundred and fifteen dollars per share; (3) in representing to the Tjosevigs that the company was the owner of several plants of the total value of about five hundred thousand dollars, and that one of the plants, located at Plainfield, New Jersey, had a value of about four hundred thousand dollars, whereas, it owned only one plant, worth not to exceed fifteen thousand dollars; (4) in representing that the company had been declaring dividends only from its net earnings, whereas it had paid them solely from capital assets; (5) in representing that the company had purchased from the Maine corporation its assets and business worth two million dollars, when, in fact, that company was insolvent; (6) in representing that the company owned the basic patents under which it was operating, when, in fact, it had only a license; (7) in representing that the company owned all of United Electric Service Co. of New York, a corporation, when, in fact, it owned or held only fifty-one per cent of its stock; (8) in representing that the company owned all of Instantaneous Alarm Co. of Seattle, a corporation, when, in fact, it owned only a portion of its stock; (9) in representing that the respondents were the outstanding citizens of Seattle and that they had invested large sums of money in the common stock of the company, when, in fact, they had paid nothing for their stock; (10) in representing that all of the common stock of the company had been paid for in full and that the

company had received full value therefor, when, in fact, the company had received an average of only one dollar per share therefor; (11) in representing that the stock would shortly be placed on the New York stock exchange, which was never done; and (12) in subsequently representing that the preferred stock which appellants had bought was an excellent investment and that the company was in sound financial condition, all of which, it is alleged, was untrue.

At the conclusion of the evidence, a ruling being invoked, the court held that fraud had not been established by clear and convincing evidence, and thereupon sustained the motion challenging its sufficiency.

Our statement of the case has been somewhat lengthy, but it has seemed necessary to go into the details in order to have an intelligible understanding of the situation.

As has already been stated, there are two causes of action, one upon the complaint of Christian Tjosevig, Eli Tjosevig and Chitna Investment Company, and the other upon the complaint of Christine Tjosevig.

As to the first cause of action, there can be, in our opinion, no question that it is barred by the statute of limitations. For more than three years prior to the commencement of this action, Mr. and Mrs. Tjosevig, individually and as owners and principal officers of Chitna Investment Company, were fully aware of the facts underlying the alleged charges of fraud which they make in their present complaint. During the period intervening between 1923 and 1926, their suspicions led them to make very intensive investigations regarding the affairs of the company, and their investigations not only gave them a clue, but also furnished them with all the information on which the former litigation was based. The charges made in the complaints

in those actions are substantially the same as those made here.

The statute of limitations begins to run, not only upon discovery of fraud, but also from the time when the fraud should have been discovered; and a clue to the facts, which, if diligently pursued, would lead to a discovery, is in law equivalent to discovery itself. Notice sufficient to excite attention and put a person on guard or to call for an inquiry is notice of everything to which such inquiry might have led. *Deering v. Holcomb,* 26 Wash. 588, 67 Pac. 240, 561; *Irwin v. Holbrook,* 32 Wash. 349, 73 Pac. 360; *Hoy v. Burk,* 92 Wash. 536, 159 Pac. 701; *Johnston v. Spokane & Inland Empire R. Co.,* 104 Wash. 562, 177 Pac. 810; *Noyes v. Parsons,* 104 Wash. 594, 177 Pac. 651. If this be true, then notice, discovery *and action* thereon must, for stronger reason, set the statute in motion as against any subsequent action based on the same charges.

This case might well end here were it not for the complaint of Christine Tjosevig, the daughter, who became of age in October, 1931, which was shortly before this action was begun. In passing, it may be said that it is questionable whether, in fact, the stock which stood in Christine Tjosevig's name really belonged to her at all. It was purchased with funds which came from her father and mother and which had been, at all times, subject to the control of Mr. Tjosevig. Furthermore, the stock certificate contains on its reverse side a blank assignment bearing the signature of Christine Tjosevig witnessed by C. Tjosevig. These and other facts appearing in the record are strongly persuasive of the conclusion that Christian Tjosevig and Eli Tjosevig were at all times the real owners of the stock. If so, the second cause of action would, likewise, be barred by the statute of limitations. However, in view of all the evidence, which we must construe in its most favorable

light to appellants, we will assume that the stock was purchased and owned by Christine Tjosevig, then a minor.

This, then, brings us to the consideration of the question whether the evidence was sufficient to take the case to the jury or to support any verdict for appellants.

■ The rule that fraud must be established by clear, cogent and convincing evidence is so well settled in this state that citation of authority is unnecessary. While that rule ordinarily operates as a standard by which the jury, in a case tried by a jury, must measure and attain its verdict, the rule also operates, within certain limits, as a standard under which the case is to be submitted to the jury by the court. It is true that, in a jury case, the court may sustain a challenge to the sufficiency of the evidence or direct a verdict only when the court can say, as a matter of law, that there is neither evidence nor reasonable inference from evidence sufficient to sustain any other verdict or judgment. *Fobes Supply Co. v. Kendrick*, 88 Wash. 284, 152 Pac. 1028. It is likewise true that a judgment notwithstanding the verdict can be granted only when the court can say, as a matter of law, that there is neither evidence nor reasonable inference from evidence sufficient to sustain the verdict. *Brown v. Walla Walla*, 76 Wash. 670, 136 Pac. 1166; *Mattson v. Griffin Transfer Co.*, 90 Wash. 1, 155 Pac. 392; *Karr v. Mahaffay*, 140 Wash. 236, 248 Pac. 801. But it is also the rule that, where the evidence is so meagre or unsatisfactory as to be insufficient to justify a jury in finding a verdict by clear, cogent and convincing evidence, a challenge to its sufficiency should be sustained. *Crary v. Hopkins*, 94 Wash. 424, 162 Pac. 515; *Wright v. Collins*, 143 Wash. 162, 254 Pac. 846.

Proceeding from these rules, we take up appellants' charges of fraud. Generally speaking, they are

based upon alleged false statements contained in circulars issued, and advertisements published, by the company. So far as the circulars are concerned, appellants, at the time of trial, produced none supporting their charges. Their evidence regarding the circulars consisted solely of their memory of their contents and of alleged oral representations made about the time that the circulars were issued. The trial occurred almost sixteen years after the period during which such written and oral representations were alleged to have been made. Evidence of this kind is, in the very nature of things, unreliable, and is to be accepted with hesitation, and sometimes even with suspicion. *Frederick v. Michaelson,* 138 Wash. 55, 244 Pac. 119; *Clark v. Crist,* 178 Wash. 187, 34 P. (2d) 360; Moore on Facts, § 891. In the face of clear and positive evidence to the contrary, it has little value to sustain a charge of fraud.

We now take up appellants' specific charges of fraud. We shall not repeat them here, but shall simply refer to them in the numerical sequence in which they have already been set forth.

(1) No evidence was offered by appellants in support of this charge. Moreover, the record shows that, on January 3, 1917, A. S. Taylor was elected, and took the oath of office, as trustee for a two-year term.

(2) The controversy under this charge arises over the word "kan" used in the advertisement appearing in WASHINGTON POSTEN. According to all the witnesses, the word "kan" is used in the Norwegian language to express both ideas of "can" and "may." Appellants' own witnesses admitted that the advertisement, when translated into English, could be read either that the stock "can be redeemed" or that it "may be redeemed." The overwhelming evidence, moreover, is to the effect that the true interpretation

to be given to the advertisement is that the stock *was* *redeemable* at one hundred and fifteen dollars per share. Added to this is the incontrovertible fact that the stock certificates which were issued to appellants were in the usual form, and bore upon their very faces the statement that the stock "may be *retired* at any dividend day after five years from date . . . *at the option of the company.*" (Italics ours.) Mr. Tjosevig was, in fact, able to read and understand the English language, and his interpretation of this provision of the stock certificates is unexplained. We think appellants' contention is but a quibble upon words. Certainly, no charge of fraud could be established upon the wording of the advertisement.

(3) This charge, likewise, rests upon the difference of interpretation to be given certain words. Appellants assert that, in the circulars which they saw, representations were made to the effect that the company owned *plants* valued at five hundred thousand dollars. Such circulars as were produced, however, show that the company claimed to own plants *and equipment* valued at five hundred thousand dollars. The evidence shows beyond any reasonable question that its plants, together with the equipment that it had installed at various places, and which it leased or rented to its customers, were worth well over the amount claimed. If the various equipments are not to be considered strictly as constituting individual plants, they must at any rate be considered as products and parts of the plants which the company actually had.

(4) There was no evidence that any dividends were paid from capital assets.

(5) What the value of the assets of Aero Fire Alarm Company was at the time of their transfer to Aero Alarm Company was, of course, largely a matter of opinion, about which men might reasonably differ.

In any event, there was no evidence that they were not worth two million dollars, and there was considerable evidence that their value approximated, or even exceeded, that amount. The business of Aero Alarm Company was built upon the automatic device, and that device was of almost inestimable value to the company which controlled it.

(6) Whether or not the company *owned* the basic patents under which the fire alarm device was manufactured and sold, it did own the exclusive right to build and dispose of the automatic devices, not only in the United States, with the exception of the state of Colorado, but also in the insular possessions. In other words, its rights substantially equalled that of ownership. Besides, it is apparent from the record that appellants' purchase of the stock was not influenced at all by that consideration.

(7) Appellants do not lay any particular stress upon this charge. In any event, the evidence shows that the company acquired and owned all of the issued stock of the United Electric Service Co., and absolutely controlled that company.

(8) The same is true, to even a greater degree, of this charge.

(9) There was no evidence impeaching or in any way reflecting upon the standing of respondents in Seattle, and the charge that they did not pay for the stock which was issued to them is belied by the record, which shows that they did pay for everything that they got.

(10) The evidence upon this charge shows that of the one hundred and twenty thousand shares of common stock of the company, one hundred thousand shares had been paid for by the transfer of the Maine company's assets, which included its rights in the automatic device, and that the remaining shares

had been duly subscribed for. The evidence further shows that a portion of this stock was to be used in the campaign for raising funds to finance the business of the company. It is manifest from the record that the plan of financing the company was carried out in utmost good faith. Appellants' evidence amounts to nothing more than a criticism of the plan followed. It falls far short of establishing fraud.

(11) No evidence was offered in support of this charge. But if there had been any evidence, it would in any event have shown nothing more than a mere expression of opinion.

(12) What was said after the purchases were made was, of course, immaterial. Moreover, it is apparent that it was simply an expression of opinion, and, further, that it was fully justified by the progress that the company had been making.

This covers in detail all of the charges. It may be repeated here that the only basis for the charges was appellants' recollection, after more than fourteen years, of what had originally been represented, and that none of the charges met the test of clear, cogent and convincing evidence. To the contrary, the evidence is, by the great preponderance, the other way. In our opinion, the evidence was wholly insufficient to support a verdict, and the court was right when it sustained the challenge.

The judgment is affirmed.

BEALS, C. J., MITCHELL, HOLCOMB, and BLAKE, JJ., concur.