[No. 16681-0-II.    Division Two.    April 20, 1995.]

FLOYD OLSON, ET AL, *Appellants*, v. ELMER TRIPPEL, ET AL, *Respondents*.

*Thomas F. Peterson, Bruce Hulme Hurst,* and *Betts Patterson & Mines,* for appellants.

*Dennis Gary Seinfeld* and *Davies Pearson, P.C.,* for respondents.

MORGAN, J. — Floyd and Sandra Olson appeal orders denying summary judgment to them, and granting summary judgment to Elmer and Winifred Trippel. We reverse.

Wollochet Heights Estates is a residential subdivision in Gig Harbor, Washington. One of its blocks, block 2, contains lots 8 through 13. A map is shown below.

On October 1, 1965, a written easement agreement was executed by the owners of lots 8 through 12. It created an easement across the southwest corner of lot 12,[1] the east 12 feet of lot 9, and the north 12 feet of lot 11. It provided that the easement across the southwest corner of lot 12 "shall run with and be appurtenant to lots 8 [and] 9".[2] It further provided that the easement over the east 12 feet of lot 12 and the north 12 feet of lot 11 "shall run with and be appurtenant to lots 8, 9, and 10".[3] After execution, it was duly recorded with the county auditor.

Not long after the 1965 agreement had been executed, the Trippels purchased lots 9 and 12. They then "wish[ed] to substitute" an easement that would not bisect their newly combined lots. Thus, on May 23, 1967, they entered into a new easement agreement with the owners of lots 8, 9, 10 and 12. The new agreement provided in pertinent part:

### RECITALS

A. By an instrument dated October 1, 1965, and recorded under Pierce County Auditor's Fee No. 2121671, GRANLUND [the owner of lot 10] and BRENTIN [the owner of lot 8] were granted an easement over certain property hereinafter particularly described, for ingress and egress. The property over which such easement was granted [lot 9] is now owned by TRIPPEL.

B. TRIPPEL has, since acquiring the property mentioned in Paragraph A [lot 9], acquired additional property [lot 12] and wishes to substitute an easement over such property and in consideration thereof to receive a release and relinquishment of the above-mentioned easement.

C. All parties to this instrument are agreed that such substitution is appropriate and desirable.

### AGREEMENTS

In consideration of the foregoing, and of the conveyances and releases hereinafter made, the parties agree, convey, grant, release and relinquish, as follows:

1. GRANLUND and BRENTIN release, relinquish and convey to TRIPPEL whatever right, title or interest they may have in and to the east twelve feet of Lot 9, Block 2, Wollochet Heights

---

[1]The southwest corner was defined as a triangle with a side of 15 feet extending north along the west line of lot 12, a second side of 15 feet extending east along the south line of lot 12, and a third side connecting the other two.

[2]Clerk's Papers, at 41.

[3]Clerk's Papers, at 42.

Estates, according to Plat recorded in Book 23 of Plats, Pages 21, 22 and 23, Records of Pierce County Washington, and to the easement in their favor created by that certain instrument dated October 1, 1965 and recorded under Auditor's Fee No. 2121671, Auditor's Records of Pierce County, Washington.

2. TRIPPEL hereby grants and conveys to BRENTIN an easement for ingress and egress over the north twelve feet of Lot 12, Block 2, Wollochet Heights Estates as per the afore mentioned plat and over a triangular portion of Lot 9, Block 2 Wollochet Heights Estates, as per the afore mentioned plat, at the northeast corner of said Lot 9, measured twelve feet along the common line between Lots 9 and 12 and twelve feet along the common line of Lots 8 and 9, and by a line connecting the afore mentioned two lines to form a triangle at such northeastern corner.[4]

After execution, the 1967 agreement was duly recorded with the county auditor. As can be seen, it failed to state whether the new easement was appurtenant to lot 8 or personal to the then-owners of lot 8, the Brentins.

Today, the Trippels still own lots 9 and 12. Lot 8, however, has changed hands several times. On April 7, 1970, the Brentins executed a real estate contract giving people named Clary a vendee's interest. On February 6, 1973, the Clarys assigned their vendee's interest to people named Knapp. On February 26, 1973, the Brentins gave the Knapps a fulfillment deed. On July 16, 1974, the Knapps gave a statutory warranty deed to people named Wilson, and on December 20, 1978, the Wilsons gave a statutory warranty deed to the Olsons, who are the present owners and Appellants herein. The 1970 contract said that lot 8 was being sold "with appurtenances". The 1973 assignment and the 1973 fulfillment deed did not mention an easement or "appurtenance". The 1974 and 1978 warranty deeds specifically described an easement over the northeast corner of lot 9 and the north 12 feet of lot 12.

Through the years, the various owners of lot 8 used the easement over lots 9 and 12 as a driveway.[5] Then, in 1991, the Trippels blocked the easement by building a fence.

---

[4]Clerk's Papers, at 44-45.

[5]The Trippels state that they closed the easement for 1 day each year. However, there is no evidence the Olsons were aware of that fact before they purchased lot 8 in 1978.

In 1992, the Olsons sued to quiet title. Shortly thereafter, each side moved for summary judgment. The Olsons contended the 1967 agreement created an easement appurtenant to lot 8 which they, the present owners of lot 8, were entitled to use. The Trippels contended the 1967 agreement created an easement in gross which had expired in February 1973, when the Brentins conveyed their last remaining interest in lot 8.

Each side relied on the recorded documents in the Olsons' chain of title. The Trippels also relied on four affidavits. The first, signed by them, recounted their purchase of lots 9 and 12 and said that they had "wanted to extinguish the easement" because it bisected their newly combined lots. It then went on:

> The Brentins, however, wished to retain the use of an access to the back of their Lot 8 during their ownership of it. We agreed upon the northerly 12 feet of Lot 12 and northeast corner of Lot 9. We then had the 1967 instrument drawn up . . ..[6]

A second affidavit, signed by Aletta K. Brentin, related:

> In executing the [1967] Easement Agreement, my [deceased] husband and I intended that we were to receive only a personal interest in the new easement along the north 12 feet of Lot 12 and the northeast corner of Lot 9 (the new easement across the Trippels' northern boundary). We and the Trippels intended that the easement would last only as long as we owned lot 8.[7]

It also said that the Brentins had "considered the easement extinguished" when they sold lot 8 to the Knapps, and that they had given the Knapps a statutory warranty fulfillment deed "without purporting to convey an easement".[8]

A third affidavit, signed by Diane Clary-Lewis, said that she and her then-husband were told by a realtor that the driveway "was not a legal easement in any way but that the Trippel's [sic] were very willing to let us use their driveway as a courtesy".[9] It also said the Clarys relayed that information to the Knapps when the Knapps purchased lot 8.

---

[6]Clerk's Papers, at 39.

[7]Clerk's Papers, at 30-31.

[8]Clerk's Papers, at 31.

[9]Clerk's Papers, at 26.

A fourth affidavit, signed by the attorney who drafted the 1967 easement agreement, said in part:

> 2. . . . If I had intended that the Brentins receive an easement appurtenant to their Lot 8, I would have included their legal description and words such as "and their heirs and assigns" and would have continued the language set forth in the 1965 easement, which stated that the "easement shall run with and be appurtenant to lots 8, 9 and 10 . . .".
>
> 3. As best I can recall after so many years and based upon the language which I chose and the parties adopted, my intent in drafting and the parties' intent conveyed to me were to create a personal easement in gross which would expire upon the Brentins' sale of their parcel.[10]

As can be seen, all four affidavits recited facts extrinsic to the public record. Additionally, all four described circumstances that occurred between 5 and 11 years prior to the Olsons' 1978 purchase of lot 8.

The Olsons tried to exclude the four affidavits. Their specific argument was that the four affidavits "are not admissible in this action in that the Plaintiffs are bona fide purchasers for value and are entitled to rely on the '*documents of record*' ".[11]

The trial court overruled, holding that "evidence of the intent of the parties is always admissible and [the affidavits are] not in violation of any parol evidence rule".[12] Based largely on the four affidavits, the trial court concluded the easement was personal and the Trippels were entitled to summary judgment.

The Olsons now appeal. The main issue is whether the 1967 easement was appurtenant to lot 8 or personal to the Brentins. A preliminary issue, however, is whether the trial court erred by considering the four affidavits.

I

■■ The general rule "is that a person purchasing real property may rely on the record title to the property, in the

---

[10]Clerk's Papers, at 60-61.

[11]Clerk's Papers, at 66; see also Report of Proceedings, at 7.

[12]Report of Proceedings, at 15.

absence of knowledge of title in another, or of facts sufficient to put him on inquiry". *Lind v. Bellingham,* 139 Wash. 143, 147, 245 P. 925, 926 (1926). If this general rule applies here, the Olsons were not bound to discover or consider the matters alleged in the four affidavits, and the affidavits were irrelevant and inadmissible. ER 401-02. The Trippels contend, however, that the general rule does not apply because of (A) the inquiry rule and (B) the context rule.

## A

The inquiry rule imputes to a purchaser of real estate "notice of all facts which reasonable inquiry would disclose". *Diimmel v. Morse,* 36 Wn.2d 344, 348, 218 P.2d 334 (1950); *see also Paganelli v. Swendsen,* 50 Wn.2d 304, 308, 311 P.2d 676 (1957); *Tjosevig v. Butler,* 180 Wash. 151, 159, 38 P.2d 1022 (1934). It does not apply merely because "diligent inquiry would have led to a discovery" of pertinent facts outside the public record; rather, it applies only when a purchaser has a duty of inquiry, *i.e.,* when a purchaser has "information, from whatever source derived, which would excite apprehension in an ordinary mind and prompt a person of average prudence to make inquiry". *Paganelli,* 50 Wn.2d at 308. If the law were otherwise, it

> would impose an almost impossible burden upon a party . . . in that each and every conveyance . . . would have to be investigated beyond the auditor's records for possible error to avoid a claim of inquiry notice. This would destroy the strength of our recording system and any justifiable reliance thereon.

*Koch v. Swanson,* 4 Wn. App. 456, 459, 481 P.2d 915 (1971). The burden of showing a duty of inquiry rests on the one asserting it. *Paganelli,* 50 Wn.2d at 308; *Biles-Coleman Lumber Co. v. Lesamiz,* 49 Wn.2d 436, 439, 302 P.2d 198 (1956).

The Trippels contend the inquiry rule was triggered because "the 1967 easement stated that it was a substitute for and relinquished the 1965 easement".[13] They also contend the inquiry rule was triggered because the 1967 easement was described in the 1978 Knapp-to-Wilson deed and the 1978 Wil-

---

[13]Br. of Resp'ts, at 17.

son-to-Olson deed, but not mentioned in the 1973 Clary-to-Knapp assignment or the 1974 Brentin-to-Knapp fulfill-ment deed. There is no contention that the inquiry rule was triggered because of an occurrence or transaction outside the public record.

The inquiry rule was not triggered because the 1967 ease-ment stated that it was a substitute for the 1965 easement. Referencing the 1965 agreement, which had provided for easements over lots 9, 11 and 12 that "shall . . . be appur-tenant to" lots 8, 9 and 10, the 1967 agreement stated that "Trippel wishes to substitute" an easement over different parts of lots 9 and 12. It gave no hint that the new, substitute easement would be of a type different from before. It gave no hint that the new, substitute easement would terminate sooner, or under different conditions, than the old one would have. It would not have caused a reasonable person to think that the 1967 easement might be of a type different from the 1965 one, and it did not give rise to a duty of inquiry on the part of the Olsons.

■ ■ Likewise, the inquiry rule was not triggered because of what the Trippels call "a gap in the chain of title".[14] An appurtenant easement is part of the realty it benefits. *Green v. Lupo*, 32 Wn. App. 318, 323, 647 P.2d 51 (1982); *Clippinger v. Birge*, 14 Wn. App. 976, 985, 547 P.2d 871 (1976). It passes with the dominant estate unless the parties otherwise agree.[15] *Cowan v. Gladder*, 120 Wash. 144, 145, 206 P. 923 (1923); *Kirk v. Tomulty*, 66 Wn. App. 231, 239, 831 P.2d 792, *review denied*, 120 Wn.2d 1009 (1992); *Green*, 32 Wn. App. at 323; *Winsten v. Prichard*, 23 Wn. App. 428, 431, 597 P.2d 415 (1979); *Clippinger*, 14 Wn. App. at 938 (quoting *Restatement of Property* § 487, at 3030 (1944)); 6A Richard R. Powell, *Law of Property* § 899[3][i], at 81A-126 (1992) (Patrick J. Rohan ed., 1991) ("even

---

[14]Br. of Resp'ts, at 18.

[15]Parenthetically, we note that in August 1992 Aletta Brentin quitclaimed to the Trippels any interest she might still have to the easement in question here. Because of the principle stated in the text, Brentin had been without an interest in the ease-ment since 1974, when she and her husband deeded lot 8 to the Knapps. Thus, her quitclaim deed had no effect.

if the owner of the dominant estate conveys his or her land without specific mention of the easement, the conveyance nevertheless incorporates the easement"). Thus, its omission from a conveyance is without legal significance and would not cause a reasonably prudent person to inquire beyond the record. *Winsten,* 23 Wn. App. at 431. We conclude that the Olsons were not under a duty of inquiry.

## B

The Trippels contend that even if the Olsons did not have a duty of inquiry, the four affidavits were admissible by virtue of the "context rule" announced in *Berg v. Hudesman,* 115 Wn.2d 657, 667-69, 801 P.2d 222 (1990). That rule requires that a court construing a written agreement consider not only the writing, but also the context in which it was executed. *Berg,* at 667-69. Necessarily, it also allows for the admission of evidence extrinsic to the writing itself, provided the evidence shows the parties' objective manifestations as opposed to their "[u]nilateral or subjective purposes and intentions". *Lynott v. National Union Fire Ins. Co.,* 123 Wn.2d 678, 684, 871 P.2d 146 (1994).

Assuming without holding that the context rule may be applied in a dispute between an original grantor and an original grantee of real estate, *see Green,* 32 Wn. App. at 323 (pre-*Berg* parol evidence case), it cannot be applied in a dispute between an original party and a subsequent purchaser who is not under a duty of inquiry. To hold otherwise would be to require that a subsequent purchaser investigate not only the chain of title, but also the "context" within which each conveyance in the chain was executed. That would be an impractical burden, perhaps an impossible one, and would virtually destroy the utility of the real estate recording system. Because the Olsons were subsequent purchasers not under a duty of inquiry, we hold that the context rule does not apply in this case.

Concluding this part of our discussion, we hold that in a dispute involving a subsequent purchaser of real estate, as opposed to a dispute between the original grantor and grantee, the inquiry rule displaces the context rule. Further, we hold

that the Trippels have failed to show that the Olsons were under a duty of inquiry. Finally, we hold that the trial court erred by considering the four affidavits, all of which recited facts that the Olsons were not bound to know or consider.

## II

■ We return now to whether the 1967 easement was appurtenant to lot 8 or personal to the Brentins. We review the record in the same way as the trial court should have. *Rice v. Dow Chem. Co.*, 124 Wn.2d 205, 208, 875 P.2d 1213 (1994); *Syrovy v. Alpine Resources, Inc.*, 122 Wn.2d 544, 548 n.3, 859 P.2d 51 (1993). Thus, we consider the documents in the Olsons' chain of title, but not the four affidavits discussed above.

■ An easement is an interest in land that burdens the servient estate. *Berg v. Ting*, 125 Wn.2d 544, 551, 886 P.2d 564 (1995). It can be appurtenant or in gross. *Winsten*, 23 Wn. App. at 430. If appurtenant, it benefits the dominant estate; if in gross, it benefits a person or entity. *Cowan*, 120 Wash. at 145; *Roggow v. Hagerty*, 27 Wn. App. 908, 911, 621 P.2d 195 (1980); *Winsten*, 23 Wn. App. at 430. Generally, it ends when its purpose ends.[16] *Coast Storage Co. v. Schwartz*, 55 Wn.2d 848, 853, 351 P.2d 520 (1960); 3 Herbert T. Tiffany, *Real Property* §§ 761, 817 (3d ed. 1939).

Here, the 1967 easement was "to substitute" for the 1965 one. The 1965 easement was "appurtenant to" lot 8. It follows that the 1967 easement was appurtenant to lot 8.

■ This logic is supported by a variety of other considerations. First, there is a "very strong" presumption that an easement is appurtenant rather than in gross. *Pioneer Sand & Gravel Co. v. Seattle Constr. & Dry Dock Co.*, 102 Wash. 608, 618, 173 P. 508 (1918); *Green*, 32 Wn. App. at 323;

---

[16]At various points in their briefs, the parties seem to assume that an easement in gross ends when its owner ceases to own the dominant estate. This proposition is open to question, however, because an easement in gross does not require a dominant estate. In general, the authorities state that an easement in gross "cannot endure beyond the lifetime of the owner". *Restatement of Property* § 492 cmt. (c), at 3047 (1944); *see also* 7 *Thompson on Real Property* § 60.02(f)(2) (David A. Thomas ed., 1994); 3 Richard R. Powell, *Powell on Real Property* § 419 (Patrick J. Rohan ed., 1991).

*Roggow*, 27 Wn. App. at 912; *Winsten*, 23 Wn. App. at 430; *Kemery v. Mylroie*, 8 Wn. App. 344, 346, 506 P.2d 319 (1973); *see Kirk*, 66 Wn. App. at 239. As a result, an "easement is not in gross when there is anything in the deed or the situation of the property which indicates that it was intended to be appurtenant to land retained or conveyed by the grantor". *Green*, 32 Wn. App. at 323 (citing 2 George W. Thompson, *Real Property* § 324, at 78 (1980 repl.)). This presumption applies here,[17] and it strongly supports the view that the 1967 agreement created an easement appurtenant to lot 8.

Second, the 1967 agreement is silent about changing the easement from one that was appurtenant to one that was in gross. It is also silent about the new easement terminating at a time different from the old one, or under different conditions. Such changes would have been important to all concerned, and one would expect them to be stated in the 1967 agreement.

■ Third, the record fails to show any reason why the Brentins would have wanted an easement for ingress and egress that was not appurtenant to lot 8. An appurtenant easement gave them a right to ingress and egress while they owned lot 8. A personal easement would have given them a right to ingress and egress at times when they did not own lot 8. Lot 8 being residential and noncommercial, we perceive no reason why its owners, including the Brentins, would have wanted a right of ingress and egress at times when they did not own the property itself. *See Winsten*, 23 Wn. App. at 430-31 (ingress and egress to residential property ordinarily associated with land use rather than personal convenience).

Fourth, the 1967 easement agreement supports an inference that the parties' purpose was to substitute an easement that would not bisect lots 9 and 12. To accomplish that pur-

---

[17]Analogizing to evidential presumptions, the Trippels argue that the presumption described in the text disappears in the face of evidence to the contrary. We reject that argument. Unlike an evidential presumption, the presumption in the text is designed to effectuate a substantive policy favoring appurtenant easements and disfavoring easements in gross.

pose it was not necessary to change the easement from one appurtenant to one in gross.

Fifth, the 1967 easement agreement was signed by Granlund, the owner of lot 10, as well as by the Trippels and the Brentins. Thus, it left lot 10 with an appurtenant easement, and we perceive no reason why the parties would have wanted to treat lot 10 differently from lot 8.

Sixth, the 1967 easement agreement indicates that the parties were trading one easement for another, without additional consideration. This is consistent with trading easements of the same character, and arguably inconsistent with trading an easement of one character (appurtenant) for an easement of a different character (in gross).

Finally, we are not persuaded by the Trippels' argument that the 1967 agreement created an easement in gross because it referred to the Olsons, Brentins, and Granlunds by name, rather than as the owners of their respective lots. Although such language might be significant in other circumstances, it is insignificant here, for it does not overcome the many indications that an easement appurtenant was created. Moreover, similar language was used in the 1965 agreement, and that agreement expressly created easements appurtenant to lots 8, 9 and 10.[18]

In conclusion, the effect of the 1967 easement agreement was to create an easement appurtenant to lot 8. The judgment in favor of the Trippels is reversed, and the case is remanded for entry of judgment in favor of the Olsons.

BRIDGEWATER, J., and UTTER, J. Pro Tem., concur.

Review denied at 127 Wn.2d 1013 (1995).

---

[18]The Trippels also argue that the omission of language referring to "heirs and assigns" indicates a personal easement. That is a factor, but it does not overcome the contrary facts present here.