177 P.3d 201 (2008)
GOLD CREEK NORTH LIMITED PARTNERSHIP; Paul E. Miller, an individual; and Deidra J. Miller, an individual, Respondents,
v.
GOLD CREEK UMBRELLA ASSOCIATION, a Washington nonprofit" corporation, Appellant.
No. 35301-6-II.
Court of Appeals of Washington, Division 2.
February 20, 2008.
*202 Robert G. Casey, Attorney at Law, Tacoma, WA, for Appellant.
Blake Edward Marks-Dias, Daniel Joseph Gunter, Courtney L. Seim, Riddell Williams PS, Seattle, WA, for Respondents.
ARMSTRONG, J.
¶ 1 The Millers[1] sued the Gold Creek Umbrella Association (Association) to establish an express easement for ingress and egress across Association property to the Millers' adjoining property to the north. When the Millers rested, the Association moved to dismiss under CR 41(b)(3) (failure to prove a claim). The trial court ruled that the Millers were entitled to an express easement across the Association's property. The Association raises a number of issues but principally argues that the trial court should have dismissed the Millers' express easement claim. We agree; accordingly, we reverse and remand for the trial court to enter an order dismissing the Millers' express easement claim.

*203 FACTS
¶ 2 In the 1970s, the Miller family (Edward and Juanita and their children, Paul and Deidra) owned a large piece of real property in Pierce County between Narrows Drive and the Burlington Northern Railroad. Today, that property is divided, with the northern undeveloped part known as "Gold Creek North" and the southern developed part known as "Gold Creek South." The Association now owns Gold Creek South, which contains three condominium developments the Association governs. Gold Creek North is owned by successors-in-interest to the Miller family; the Gold Creek North Limited Partnership and Paul and Deidra Miller.
¶ 3 The Millers intend to build 62 homes on Gold Creek North, and to do so, they seek access to their property through Gold Creek South. In this quiet title action, the Millers allege that they have "easement rights" over Gold Creek South by way of certain documents executed in the 1970s and 1980s. Clerk's Papers (CP) at 8.
1. Transactions Purportedly Creating Easement
¶ 4 In 1977, the Millers negotiated a real estate transaction with Donald Huber,[2] giving him an option to purchase the entire Gold Creek property in two stages, beginning with Gold Creek South. The document detailing this arrangement is not in the record.
¶ 5 On December 27, 1979, after Huber rezoned Gold Creek South, the Millers and Huber executed a "Gold Creek Parcel A Real Estate Purchase and Sale Agreement" (1979 P & S Agreement) to govern Huber's purchase of Gold Creek South. Section 8 of that agreement was entitled "Sellers' Easement" and provided:
As a material consideration to Seller [Millers], Buyer [Huber] has agreed to grant Seller an unspecified and undefined easement (the "Sellers' Easement") for road and utility access down and across to the Sellers' properties. . . . The Sellers' Easement shall be granted and defined only in accordance with the following conditions:
(i) The purpose shall be for the reasonable access to the Sellers Parcels;
(ii) Sellers' Easement shall run with and be deemed appurtenant to their said properties located adjacent to the south and north sides of the sale property;
(iii) Sellers shall have no right to establish, define or use Sellers' Easement until written notice is given that Sellers will be commencing substantial development of their property or properties within six (6) months;
(iv) Sellers' development and usage of said easement shall comply with the laws and regulations of the City of Tacoma (the "City");
(v) The location of Sellers', Easement shall be determined by mutual reasonable agreement of Sellers, Buyers and the City in conjunction with Sellers' application process with City for preliminary plat approval for the development of Sellers' Parcel; and
(vi) Sellers shall cause the Sellers' Easement to be a hard-surfaced road so as not to create dust or noise disturbance.
Resp'ts Exh. 3, at 7. This document was neither notarized nor recorded until 1992.
¶ 6 Also on December 27, 1979, the Millers conveyed a portion of Gold Creek South (known as "Phase I") to Huber and executed a real estate contract for the sale of the rest. The contract included a "Sellers' Easement" provision stating, "Purchasers shall provide all access and utility easements to Sellers in accordance with Section 8 of the Gold Creek Parcel A Real Estate Purchase and Sale Agreement by and between the parties dated December 27th, 1979." Resp'ts Exh. 6. The contract was recorded on February 26, 1980. Huber then began constructing the Gold Creek Condominium development on the Phase I property.
¶ 7 In 1981, the Millers and Huber amended an unrelated easement agreement to correct the legal description and to include: *204 "Except for the modifications set forth in this Amendment, the terms and conditions of the Gold Creek Parcel A Real Estate Purchase and Sale Agreement dated December 27, 1979 by and between the parties hereto shall remain in full force and effect." Resp'ts Exh. 7, at 2.
2. Subsequent Transactions
¶ 8 In May 1982, Huber executed as declarant the "Gold Creek Umbrella Declaration and Covenants, Conditions, Restrictions, Easements and Reservations" ("Umbrella Declaration" or "the Declaration"). Article 2 of the Declaration subjected all of Gold Creek South (the "Entire Property") to its terms, which were declared to run with the land and be binding on "Declarant, its successors, and assigns, and all Persons, including Owners, who now or hereafter own or acquire an interest in any Phase Parcel or any part thereof." Resp'ts Exh. 8, at 4. The Millers also signed the Declaration, agreeing to "subject . . . their or any of their . . . interests in that Contract of Sale recorded February 26, 1980" and any property interest in Gold Creek South to the Umbrella Declaration. Resp'ts Exh. 8, at 30. The Declaration thus referred to the Real Estate Contract recorded in February 1980, which in turn incorporated the easement rights set forth in the 1979 P & S Agreement. The Declaration was recorded on May 28, 1982.
¶ 9 Section 16.4 of the Umbrella Declaration, entitled "Reservation of Access and Utilities Easements Related to Declarant's Other Parcel,"[3] provides:
Declarant owns or has the right to acquire Declarant's Other Parcel, which lies in a northerly direction from the Umbrella Property. Declarant hereby reserves for itself, its successors and assigns, an easement for pedestrian and vehicular ingress and egress to and from Narrows Drive and Declarant's Other Parcel [Gold Creek North]. . . . Declarant also hereby reserves for the benefit of Declarant's Other Parcel, an easement for a storm water line to run from the Declarant's Other Parcel to a location acceptable to Declarant and located approximately on the cliff of the Greenbelt Area above Puget Sound Declarant shall, as soon as reasonably possible, and in any event, within ten years of the recording of this Declaration, establish, of record, the location of all easements and related improvements arising out of this Section 16. All easements reserved and granted under this Section 16.4 are for the benefit of Declarant and any present and future Owner of all or any portion of Declarant's Other Parcel, including their respective grantees, successors, heirs, executors, administrators and assigns. . . . All terms and provisions of this Section 16.4 shall be deemed covenants running with the land and shall bind the Greenbelt Area as the servient tenement in favor of the Declarant's Other Parcel as the dominant tenement and shall at times inure to the benefit of and be binding upon each Person who has at any time an interest or estate in any part of the Greenbelt Area or Declarant's Other Parcel. This Section 16.4, however, shall be void and of no effect, without action by any Person, if Declarant fails to acquire, or record, fee title or a real estate contract vendee's interest in Declarant's Other Parcel within five years from the date hereof
Resp'ts Exh. 8, at 24-25.
¶ 10 Two days after executing the Declaration and according to its terms, Huber conveyed the "Umbrella, Property" to the Association by quitclaim deed. The term "Umbrella Property" denotes all common or non-condominium areas in Gold Creek South, including roadways providing access to Narrows Drive. Huber then began selling condominium units in the Phase I development.
¶ 11 In 1985, Huber experienced financial difficulties. As a result, his financer, Citizens Federal Savings & Loan, assumed Huber's interest in Gold Creek South. Citizens Federal approached the Millers about choosing a location for their Sellers' Easement over Gold Creek South. The Millers were not ready to develop Gold Creek North yet, so they executed a "Gold Creek Parcel A Stipulation" with Citizens Federal, stating:

*205 WHEREAS on December 27, 1979, the Sellers entered into and signed the "Gold Creek Parcel A Real Estate Purchase and Sale Agreement", (copy attached hereto), with Gold Creek Limited Partnership and Donald G. Huber; and
WHEREAS, Citizens Federal . . . has subsequently taken over the original purchase contract on the Gold Creek property, and
WHEREAS, Citizens Federal . . . has paid said contract in full and desires a Warranty Deed to the Gold Creek property, and
WHEREAS, Citizens Federal . . . is currently in the process, of selling the Gold Creek property, now
THEREFORE, it is hereby acknowledged and agreed by both the, Sellers and the Buyer that all conditions as set forth in said "Gold Creek Parcel A Purchase and Sale Agreement" remain in full force and effect and shall continue to be binding on the parties hereto, specific reference is made to Section 8, "Sellers' Easement", and
FURTHER, that this stipulation shall inure to the benefit of and be binding upon the heirs, successors, and assigns of each of the parties hereto.
Resp'ts Exh. 11. No member of the Association signed the stipulation individually or as a representative of the Association, and it was not recorded until six years later, in 1991.[4]
¶ 12 A few weeks after they executed the stipulation, the Millers conveyed the non-Phase I portions of Gold Creek South to Citizens Federal, which later conveyed the same property to Towne and Patricia Collins; the Collinses conveyed the property to the Association in 1987.
¶ 13 In 2005, the Millers hired engineers and contractors to prepare to develop Gold Creek North, but the Association refused them access to the property through Gold Creek South. The Millers filed this quiet title action in March 2006.
3. Trial
¶ 14 Because the Millers alleged several theories in support of their easement claim,[5] the trial court bifurcated the action, setting the Millers' express easement claim first. At the end of the Millers' case, the Association moved to dismiss under CR 41(b)(3). The Millers argued that they had established an express easement on two independent bases: (1) the 1980 real estate contract, which incorporated the provisions of the 1979 P & S Agreement by reference, and (2) "inquiry notice." Report of Proceedings (RP) at 232.
¶ 15 The trial court ruled that the Millers were entitled to an express easement, reasoning that the 1979 P & S Agreement created an "equitable covenant" for "a conditional future interest in the form of an easement [for access to Gold Creek North] burdening the servient estate, Gold Creek South." CP at 739. The court also ruled that the Collinses and Citizens Federal acknowledged the reserved easement in the October 1985 deed from Citizens Federal to the Collinses, and that the Association had actual and constructive notice of the covenant because of various documents referring to the covenant. Although the parties discuss several issues, one is controlling: whether the Millers established a right to an express easement.

ANALYSIS

I. Denial of CR 41(b)(3) Motion to Dismiss
¶ 16 The Millers argue that they established an express easement because the 1980 Real Estate Contract incorporated by reference the provisions in the 1979 P & S Agreement. The Association responds, in part, that the Millers relinquished whatever easement rights they originally had by signing the Umbrella Declaration because Section 16.4, which defined and granted those rights to any present or future owner of the Millers' property, became void and of no effect when Huber (1) failed to purchase or contract to purchase the Millers' property within five *206 years of the date of the Declaration and (2) failed to establish of record the location of the easement.
¶ 17 The trial court based its decision on the documents executed between 1977 and 1985. In basing its decision on the paper record, the trial court engaged in a legal analysis of what the undisputed document language means. We review this legal decision de novo. Tacoma Northpark, LLC v. NW, LLC, 123 Wash.App. 73, 80, 96 P.3d 454 (2004). In the context of the Association's CR 41(b)(3) motion, the legal question is whether the Millers presented a prima facie case establishing an enforceable right to an express easement. In re Dependency of Schermer, 161 Wash.2d 927, 939-40, 169 P.3d 452 (2007). If not, the trial court erred in denying the Association's motion to dismiss.
¶ 18 Easements are interests in land and therefore must be conveyed by a deed complying with the statute of frauds. RCW 64.04.010; Berg v. Ting, 125 Wash.2d 544, 551, 886 P.2d 564 (1995). A grantor must intend to convey an easement. M.K.K.L, Inc. v. Krueger, 135 Wash.App. 647, 654, 145 P.3d 411 (2006), review denied, 161 Wash.2d 1012, 166 P.3d 1217 (2007). We construe the parties' intent from the language in the instrument purporting to grant the easement. Schwab v. City of Seattle, 64 Wash.App. 742, 751, 826 P.2d 1089 (1992).
¶ 19 The Millers rely on the language in the 1979 P & S Agreement and the Real Estate Contract recorded in February 1980 that incorporated that language. The relevant provision of the 1979 P & S Agreement states: "Buyer has agreed to grant Seller an unspecified and undefined easement (the `Sellers' Easement') for road and utility access." Resp'ts Exh. 3, at 7 (emphasis added). The Agreement also provides that "[t]he Sellers' Easement shall be granted and defined only in accordance with [six] conditions," including that "Sellers shall have no right to establish . . . Sellers' Easement until written notice is given that Sellers will be commencing substantial development of their property or properties within six (6) months." Resp'ts Exh. 3, at 7 (emphasis added). The Real Estate Contract similarly states that "[p]urchasers shall provide all access and utility easements to Sellers in accordance with [the 1979 P & S Agreement]," Resp'ts Exh. 6 (emphasis added).
¶ 20 This language manifests an intent to create an easement, but it does not create the easement itself. Rather, both the 1979 P & S Agreement and the 1980 Real Estate Contract unequivocally describe Huber's promise to grant an easement in the future.[6] And the Millers offered no evidence that they or Huber or his successors ever defined the easement by legal description or that' Huber or his successors ever granted the Millers an easement by deed. Still, the question remains whether the Millers' contract right to acquire an easement is enforceable against the Association.
¶ 21 For the Millers to prevail, they had to prove that (1) Huber's contract duty to grant them an easement ran with the land arid, thus, was enforceable against subsequent owners,[7] and (2) that condominium owners in Gold Creek South (as represented by the Association here) had notice at the time they purchased their units of the Millers' right to an easement. See Spokane Sch. Dist. No. 81 v. Parzybok, 96 Wash.2d 95, 96-97, 633 P.2d 1324 (1981) (option enforceable against only those subsequent owners who have notice of it); see also Crowley v. Byrne, 71 Wash. 444, 449-50, 129 P. 113 (1912). The Millers have *207 failed to prove notice to the Association's members.
¶ 22 As a general rule, a person purchasing real property may rely on record title to that property in the absence of actual knowledge of another's title or facts sufficient to put him on notice of it. Olson v. Trippel, 77 Wash.App. 545, 550-51, 893 P.2d 634 (1995) (quoting Lind v. Bellingham, 139 Wash. 143, 147, 245 P. 925 (1926)). Notice need not be actual or full knowledge but consists of information from whatever source that "would excite apprehension in an ordinary mind and prompt a person of average prudence to make inquiry." Daly v. Rizzutto, 59 Wash. 62, 65, 109 P. 276 (1910) (quoting Bryant v. Booze, 55 Ga. 438 (1875)); Olson, 77 Wash.App. at 551, 893 P.2d 634 (quotation omitted). That information must create such "`a visible state of things as is inconsistent with a perfect right in him who proposes to sell.'" Paganelli v. Swendsen, 50 Wash.2d 304, 308, 311 P.2d 676 (1957) (quoting Bernard v. Benson, 58 Wash. 191, 196, 108 P. 439 (1910)). Where circumstances alone are relied on, with no proof of actual knowledge, they must be of such character that failure to make the inquiry amounts to bad faith. Daly, 59 Wash., at 66, 109 P. 276 (quoting E.B. Millar & Co. v. Olney, 69 Mich, 560, 569, 37 N.W. 558 (Mich.1888)). Furthermore, a circumstance that should lead a person to inquire provides notice only of what a reasonable inquiry would reveal. Paganelli, 50 Wash.2d at 309, 311 P.2d 676 (citing Tjosevig v. Butler, 180 Wash. 151, 159, 38 P.2d 1022 (1934)).
¶ 23 The only notice available to condominium owners who bought units between 1982 and the recording of the stipulation in 1991 was the 1980 Real Estate Contract, which provided that "Purchasers shall provide all access and utility easements to Sellers in accordance with Section 8 of the [1979 P & S Agreement] by and between the parties." Resp'ts Exh. 6. This language would give a reasonable condominium buyer notice of a promise solely between Huber and the Millers. The contract defines no rights or duties extending to. Huber's and the Millers' successors and assigns or, more importantly, to future owners of the properties at issue. And real estate contracts are financing documents that typically apply only to buyer and seller. See 18 William B. Stoebuck and John W. Weaver, Washington Practice: Real Estate: Transactions § 21.2, at 442-43 (2d ed.2004). In addition, the 1980 Real Estate Contract relies, by reference, on an unrecorded documentthe 1979 P & S agreement. Even that agreement does not grant rights or impose duties on successors-in-interest or subsequent owners of the properties; it too is limited to Huber and the Millers. These documents are wholly inadequate to give condominium buyers notice that the Millers claimed an ongoing right to encumber the condominium property with an easement for access to their property to the north.
¶ 24 The only other document that could have given notice to condominium buyers of the Millers' claimed easement right is the Umbrella Declaration. Declarations are the operative documents for condominiums and in some states are referred to as "master deed[s]." 15A Am.Jur.2d Condominiums & Cooperative Apartments § 7, at 779 (2d ed.2000); see also CBK Brook House I Ltd. P'ship v. Berlin, 64 Mass.App.Ct. 913, 834 N.E.2d 1251, 1254 n. 4 (Mass.App.Ct. 2005) (master deed prescribes the rules of the game). In other words, they spell out the true extent of the purchased interest. Woodside Vill. Condo. Ass'n, Inc. v. Jahren, 806 So.2d 452, 456 (Fla.2002) (quoting Pepe v. Whispering Sands Condo. Ass'n, Inc., 351 So.2d 755, 757 (Fla.Dist.Ct.App.1977)). Declarations not only prescribe the governance structure of the development, but they also serve to give notice to individual buyers of the significant terms of any encumbrances, easements, liens, and matters of title affecting the condominium development. See generally 4 Frederic White, Thompson on Real Property Condominiums & Cooperatives § 36.09(j), at 258 (2d Thomas ed.2004).
¶ 25 The Declaration here fails to provide notice of the Millers' alleged easement. It is entitled "Gold Creek Umbrella Declaration and Covenants, Conditions, Restrictions, Easements and Reservations" and submits the entire property to the encumbrances *208 stated within it. Resp'ts Exh, 8. Section 3.2 of the Declaration provides that the condominium owners' right to use the common areas is subject only to the terms of the Umbrella Declaration, bylaws, and rules and regulations established by the Umbrella Board. Article 16 then creates numerous easements, including construction and sales-related easements reserved by declarant, trail linkage easements, a greenbelt area recreational easement, and the "Access and Utilities Easements Related to Declarant's Other Parcel" at issue in this case. These provisions, as a whole, clearly suggest that Huber and the Millers intended to set forth all the encumbrances to which Gold Creek South would be subject. The Millers themselves signed this document, agreeing to "subject" all of their contract and property interests in the property to it, with no mention of their claimed pre-existing, independent easement rights. The Declaration language obligated the Millers to give clear notice that they claimed an independent easement that ran with the land and that was not subject to the conditions imposed by Section 16.4. See 15A Am.Jur.2d Condominiums & Cooperative Apartments § 8, at 780 ("A declaration of condominium and its amendments should be strictly construed to assure investors that what the buyer sees the buyer gets."). In the absence of any such action, a buyer would reasonably conclude that the Millers had abandoned their previous easement rightswhatever those were by signing the Declaration.
¶ 26 The language in Section 16.4 further confuses the situation. That section purports to grant the Millers, as the "present . . . Owner" of Gold Creek North, the same easement Huber reserved to himself. But Huber's easement expired if he failed to purchase the property within five years of the Declaration, and Huber was further obligated to physically locate his easement within ten years after filing the Declaration. A condominium buyer could reasonably assume that both conditions applied to any rights the Millers might have retained from the 1980 real estate contract after subjecting their interests in that contract to the Declaration's terms. Whether or not such a reading of Section 16.4 is correct, we conclude that Section 16.4's language, coupled with the language from the only recorded documents, is so hopelessly muddled as to preclude any clear notice that the Millers would indefinitely retain a separate encumbrance, unaffected by the Declaration and enforceable against the Association, long after Huber stepped aside and the Section 16.4 expired.[8]
¶ 27 We conclude that the trial court erred in finding the Millers' evidence sufficient to establish a prima facie showing of an express easement that would bind the condominium owners. Accordingly, the trial court erred in denying the Association's CR 41(b)(3) motion.

II. Remand to New Judge
¶ 28 The Association asks us to remand to a different judge, arguing that the trial judge's ruling in this case was "extraordinary" and that it "can not expect that the trial court will be open to its testimony and evidence in light of the fact that the court has pre-determined the result." Br. of Appellant at 48.
¶ 29 Nothing in the record suggests that the trial judge was biased against the Association. And we have held that the Association is entitled to judgment as a matter of law on the Millers' .express easement claim. We decline to remand for further proceedings before a different judge.

III. Attorney Fees
¶ 30 Both parties request attorney fees and costs under RAP 18. The Association requests *209 fees under Section 8.2 of the Umbrella Declaration, which provides:
If a legal action is brought to interpret or enforce compliance with the provisions of this Umbrella Declaration, the Umbrella Articles, the Umbrella Bylaws, or the rules or regulations of the Umbrella Association, the prevailing party shall be entitled to . . . reasonable expenses, court costs, and attorney's fees in the amount awarded by the Court.
Resp'ts Exh. 8, at 12. Because our decision centers on the significance and application of the Declaration, the Association is entitled to fees and costs under this provision.
¶ 31 We reverse and remand for the trial court to enter an order dismissing the Millers' express easement claim.
We concur: HOUGHTON, C.J., and VAN DEREN, J.
NOTES
[1] We refer to both the current and original owners of Gold Creek South as "the Millers"; any changes in ownership have been within that family and are inconsequential to this appeal.
[2] Huber, not a party to this case, was acting at all times as the sole general partner of the Gold Creek Limited Partnership.
[3] "Declarant's Other Parcel" refers to Gold Creek North.
[4] Paul Miller testified that the Millers forwarded the stipulation to Citizen Federal's escrow arm with instructions to record it, but they failed to do so.
[5] The Millers also claimed that they have an implied easement from necessity and raised various tort claims.
[6] The Millers point to Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wash.2d 873, 877, 73 P.3d 369 (2003), for the proposition that the contractual language, "the Purchaser . . . agrees to grant . . . the necessary right-of-way," is sufficient to establish an express casement. (Emphasis omitted.) But in that case, the parties did not dispute that an easement had been created; the dispute was whether the terms allowed for modification of the easement's scope based on future demands. See Sunnyside Valley, 149 Wash.2d at 884, 73 P.3d 369. Even if the court had held the language sufficient to create an easement, the terms were distinguishable from the terms of the 1979 P S Agreement in that they did not, as in this case, place numerous conditions precedent on granting the easement.
[7] Huber conveyed only the property to the Association; he never delegated his contract duties under either the 1979 P S Agreement or the 1980 Real Estate Contract to it.
[8] The Millers also contend that the Association had actual notice of their casement rights. But the evidence they offered at trial proves notice only to Citizens Federal, the Collinses, and certain individual buyers after 1998. The Association represents all the owners of Gold Creek South, including those who bought their units long before the Millers recorded the 1979 P & S Agreement, and the Millers have not shown that every owner had actual notice at the time of purchase. Furthermore, the Association presented affirmative evidence that its members did not have notice; title policies for buyers as early as 1982 did not mention the Millers' easement, and when the Millers attempted to develop Gold Creek North in 2005, various Gold Creek condominium owners vigorously protested the access rights the Millers asserted over their property. The Millers have failed to prove actual notice as to all condominium owners in Gold Creek South.